# W. H. SLAY ET AL V. MARY COUTS BURNETT TRUST ET AL.

No. A-223. Decided April 25, 1945.
Rehearing overruled May 30, 1945.
(187 S. W., 2d Series, 377.)

622

*Otis Rogers,* for Proctor & Longmire, and *Martin, Moore & Brewster,* and *Wm .Pannill,* all of Fort Worth, for petitioners Slay and Simon.

It was error for the Court of Civil Appeals to hold that trustees could maintain a suit for the trust without joining the beneficiary as a party plaintiff. Cavers v: Sioux Oil & Ref. Co., 39 S. W. (2d) 862; Milmo Natl. Bank v. Cobbs, 115 S. W. 345; Galveston H. & S. A. Ry. Co. v. Butler, 56 Texas 506.

The Court of Civil Appeals erred in ignoring the defense of the election of remedies and holding that the trust could collect and retain the interest and other benefits, and in addition thereto maintain an action in damages against petitioners for secret profits. Ball v. Hopkins, 268 Mass. 260, 167 N. E. 338; Murphy-Bolanz Land & Loan Co. v. McKibben, 236 S. W. 78.

It was error to hold that notwithstanding the fact that the jury failed to agree upon a verdict and were discharged, that the trial court had the right to enter judgment against petitioners upon his own motion and without notice to them. Hines v. Parks, 128 Texas 289, 96 S. W. (2d) 970; Seastruck v. Walker, 156 S. W. (2d) 996; 41 Texas Jur. 945.

On the question that the monies received by petitioners were fees for legal services which were not in conflict with the interest of the trust. Purchase v. Atlantic Safe Dep. & Tr. Co., 81 N. J. Eq. 344, 87 Atl. 444; West Texas Bank & Tr. Co. v. Matlock, 212 S. W. 937; Young v. Barker, 141 App. Div. 801, 127 N. Y. Supp., 211.

*B. V. Thompson,* of Fort Worth, for respondents, Burnett Trust and its beneficiary.

A trustee who makes an illegal profit in breach of a trust, is liable not only for the profit, but for the loss on the loan. It also negatives any idea of good faith on his part. Jackson v. Templin, 66 S. W . (2d) 666, 92 A. L. R. 873; Walker v. Mann, 253 N. Y. S. 458; Lone Star Gas Co. v. X-Ray Gas Co., 139 Texas 546, 164 S. W. (2d) 504.

Knowledge of one breach of trust does not authorize future breaches unknown to beneficiary. Kinzbach Tool Co. v. Corbett-Wallace, 138 Texas 565, 160 S. W. (2d) 509; Jackson, Recr. v. Smith, 254 U. S. 586.

MR. JUDGE SMEDLEY, of the Commsision of Appeals, delivered the opinion for the Court.

On December 11, 1923, Mrs. Mary Couts Burnett, by trust indenture, conveyed to herself, Dr. Chas. H. Harris, Mrs. Ollie Lake Burnett, Mrs. Ella Hardin, W. H. Slay and John H. Sweatt, as trustees, property, both real and personal, of great value, for the use and benefit of Texas Christian University. The instrument authorized the trustees to take possession of the trust property and conferred upon them, in broad terms, authority to manage, sell, assign, convey and lease the property, to re-invest the proceeds, to collect rents, dividends, interest, and other revenues and any obligations arising or accruing in the conduct of the trust. It provided that Mrs. Mary Couts Burnett should be chairman of the trustees and that upon her death or resignation W. H. Slay would become chairman, and further that if any trustee should die, resign or become incapacitated, his successor should be appointed by the settlor, Mrs. Burnett, if living, and after her death by the remaining or surviving trustees. The instrument was executed by all of the trustees as well as by the settlor, and they agreed to execute the trust according to the provisions of the indenture and with all due fidelity. Mrs. Burnett, the settlor, died December 18, 1924, and W. H. Slay became chairman of the trustees. At the time of the execution of the trust indenture W. H. Slay and his partner, U. M. Simon, were Mrs. Burnett's attorneys, and upon the creation of the trust they became its attorneys.

The nature of the suit is thus stated at the beginning of the elaborate and thorough opinion of the Court of Civil Appeals:

"Plaintiffs, Dr. Charles H. Harris, E. E. Bewley, Charles F. Roeser, Mark McMahon, and W. K. Stripling, as trustees of the Mary Couts Burnett Trust, brought this suit for the use and benefit of said Trust and its beneficiary, Texas Christian University. The defendants are W. H. Slay, U. M. Simon, W. C. Proctor, Ray E. Longmire and Martha Roberta Sweatt, sole beneficiary and independent executrix of the will of John H. Sweatt, deceased, who died in July, 1941, while his depositions were being taken in this case. The original petition was filed on March 7, 1941. Plaintiffs sought recovery on nine separate and distinct transactions occurring over a period of three years,

from 1936 to 1939, any one of which would constitute the basis for a law suit. These transactions may in the main be generally classified as those wherein plaintiffs sought recovery of alleged secret profits received by Slay, Simon and Sweatt, while Slay and Sweatt were trustees and Slay and Simon were attorneys for the Trust, which secret profits were alleged to have been divided with the other defendants; and those in which plaintiffs sought to recover damages for alleged losses on loans, occasioned by breaches of trust on the part of Slay, Simon and Sweatt as trustees and attorneys and in which the other defendants are alleged to have knowingly participated."

No answer was filed by Mrs. Sweatt, independent executrix of the estate of John H. Sweatt, deceased, and no appeal was taken from the trial court's judgment rendered against her. After trial before a jury for about six weeks and the failure of the jury to agree upon answers to any of the many special issues submitted to it, the trial court discharged the jury, and, having concluded that the plaintiffs' motion for a peremptory instruction should have been granted in substance, the trial court rendered judgment "on the undisputed evidence."

It was adjudged that the plaintiffs take nothing on three of their several counts or grounds of recovery, and no complaint has been made of that part of the judgment. Judgment was rendered in favor of plaintiffs against the defendants Slay, Simon, Proctor, Longmire and Mrs. Sweatt for $4,079.00 and $80,911.-74, or the total sum of $84,990.74 "on the Big Indian Syndicate transaction of March 31, 1936"; and against defendants Slay, Simon and Mrs. Sweatt for $25,000.00 "on the Public Service Corporation loan of September 4, 1937." Judgment was also rendered in favor of plaintiffs against the defendants, or certain of the defendants, for various other substantial sums, on account of transactions in which profits were made by the defendants and losses were suffered by the trust estate. These transactions, or some of them, will be discussed hereinafter in the consideration of the assignments of error.

On appeal by the defendants Slay, Simon, Proctor and Longmire, the Court of Civil Appeals modified the trial court's judgment on the Big Indian Syndicate transaction by deducting from the judgment against Slay and Simon $4,079.00 and $5,000.00, and from the judgment against Proctor and Longmire $328.76 and $5,000.00, holding that issue of fact were raised as to those items, and affirmed the judgment as modified. For the same reason the Court of Civil Appeals modified the judgment for $25,-000.00 on the Public Service Corporation loan by deducting $1,-

500.00 from it, and affirmed it for $23,500.00. The trial court's judgment against Slay, Simon and Proctor for $14,000.00 on the Great Plains Oil & Gas Company transaction was reversed, and the judgment against Proctor and Mrs. Sweatt for $19,000.00 on the same transaction was affirmed. The judgment against Proctor and Mrs. Sweatt for $143,730.98 on the Proctor-Ward County loan was affirmed. The judgment for $146,288.71 against Slay, Simon, Proctor and Mrs. Sweatt on the Lynch loan was reversed as to Slay, Simon and Proctor. The judgment against Slay, Simon and Mrs. Sweatt on the Tex-Oil Producers loan was reversed as to Slay and Simon. The judgments on the loan made to Longmire and the Nantz-Wood loan was reversed. 180 S. W. (2d) 480.

Three applications for writs of error were filed and have been granted: one by defendants Slay and Simon, one by defendants Proctor and Longmire, and one by the plaintiffs. To avoid confusion, the parties will be referred to as they appeared in the trial court rather than as petitioners and respondents. Disposition will first be made of three questions about procedure and parties.

■ The first point in the application for writ of error filed by the plaintiffs presents the contention that the Court of Civil Appeals erred in overruling their motion to dismiss the appeals of W. C. Proctor and Ray E. Longmire, who for the purpose of perfecting appeals filed affidavits stating, in the language of Rule 355 of Texas Rules of Civil Procedure, that they were unable to pay the costs of appeal or any part thereof, or to give security therefor. To contest these affidavits the plaintiffs and the clerk of the trial court filed their signed statements, not verified by affidavits, that they believed that Proctor and Longmire were able to pay costs of appeal and to give security therefor, and in which they prayed the court to hear proof touching the same.

The court made an order setting the contests for hearing on November 21, 1942. Another order of the court, entered on the date last mentioned, recites that the hearing of the contests is postponed until December 7, 1942, upon the motion of the attorneys for Proctor and Longmire, to give them time within which to prepare and present proof touching the matters set forth in their affidavits. The transcript does not show that any further proceedings were had or that any other orders were made by the court with respect to the affidavits of inability to pay costs of appeal or the contests of the affidavits. The plaintiffs contend

that it was unnecessary to verify the contests by affidavit and that, after the contests were filed, the burden was on Proctor and Longmire to sustain the allegations of their affidavits.

Rule 355 provides that a party who is unable to pay costs of appeal or to give security therefor "shall be entitled to prosecute an appeal by filing with the clerk his affidavit stating that he is unable to pay the costs of appeal or any part thereof,. or to give security therefor"; that the clerk shall notify the opposite party or. his attorney of the filing of the affidavit; that any interested officer or party to the suit "may contest the affidavit within ten days after the giving of such notice"; and that .thereupon the court shall set the contest for hearing and the clerk shall give the parties notice of the setting. The rule further provides that "upon such hearing the burden of proof shall rest upon the appellant to sustain the allegations of his affidavit," and that "where no contest is filed in the alloted time the allegations of the affidavit shall be taken as true."

Rule 355 superseded Article 2266, Revised Civil Statutes of 1925, as amended in 1931 by Sec. 1, Ch. 134, Acts Regular Session, 42nd Legislature (Art. 2266, Vernon's Ann. Tex. Civ. Stats.). Article 2266, before its amendment in 1931, provides in substance that an appellant unable to pay costs of appeal or to give security therefor shall nevertheless be entitled to prosecute his appeal, but to do so shall make strict. proof of inability, which proof shall consist of the affidavit of the party stating his inability to pay the costs, and that the affidavit may be contested by any officer of the court or party to the suit, whereupon the court shall hear evidence and determine the right of the party to his appeal. By amendment of 1931 a provision was added that "it will be presumed, prima facie, that the affidavit of appellant speaks the truth and unless contested within ten days after being filed the presumption shall be deemed conclusive."

It was held in Currie v. Missouri, K. & T. Ry. Co. of Texas, 101 Texas 478, 108 S. W. 1167, construing Article 2266, then Article 1401, and again in Texas Electric Ry. Co. v. Cox (Com. App.) 49 S. W. (2d) 725, 89 A. L. R. 11, that an unverified traverse of an affidavit of inability to pay costs of appeal or give security therefor is insufficient to require the party appealing to make further proof of his inability. The reasons given for the ruling in the Currie case are in substance that the' affidavit is all the proof of inability that the law requires so long as it is not contested; that while the law allows a contest, it does not prescribe the manner in which the affidavit may be contested; and

that since it is the affidavit that is to be contested, it follows "that it is to be contested by something having probative force; otherwise it would be within the power of the appellee to destroy the effect given by the law to the affidavit without offering anything entitled to weigh as evidence against it."

These reasons apply with equal force to Rule 355. According to its provisions the appeal is prosecuted "by filing" the affidavit. The affidavit may be contested but no manner of making the contest is prescribed. If no contest is filed, the allegations of the affidavit are taken as true; and if a contest is filed, the burden of proof is upon the appellant at the hearing of the contest to sustain the allegations of his affidavit. Thus the affidavit serves as full proof unless it is contested. And since the rule, like Article 2266, is silent as to the manner of contesting the affidavit, the answer or denial filed for the purpose of contest, and which will require the appellant to make further proof of his inability, should have verity or probative force, that is, it also should be verified by oath.

The plaintiffs rely upon Pinchback v. Hockless, 139 Texas 534, 164 S. W. (2d) 19, and argue that the effect of Rule 355, as constructed by that decision, is "to nullify the allegations of the affidavit and to require proof thereof from the appellant." The holding in the Pinchback case is that when a party files the affidavit *and it is contested,* the burden of proof is on the appellant. The opinion states that the affidavit "was duly contested" and the record in the case shows that the contest was verified by affidavit. When no contest is filed, or when the contest is not verified by oath, the affidavit in lieu of appeal bond, stating all of the facts prescribed by the rule, is all the proof of inability that the law requires. The Court of Civil Appeals did not err in overruling the motion to dismiss the appeal.

■ By the first point in their application for writ of error, defendants Slay et al attack the decision of the Court of Civil Appeals that the Trustees can maintain this suit without being joined by the beneficiary, Texas Christian University. They rely upon the general rule that in suits affecting trusts, or respecting the trust property, the beneficiary is a necessary party. This general rule is limited by many exceptions. Cavers v. Sioux Oil & Refining Co. (Com. App.) 39 S. W. (2d) 862; Ebell v. Bursinger, 70 Texas 120, 8 S. W. 77; 42 Tex. Jur. pp. 779-781, Sec. 158; 65 C. J. pp. 869-871, Sec. 759.

The opinion in Cavers v. Sioux Oil & Refining Company (Com. App.) 39 S. W. (2d) 862, 866, quotes from Mr. Pomeroy

the rule that an action brought in furtherance of the trust, to enforce its provisions, to establish it as valid, and to procure it to be wound up and settled, may not be maintained without the presence of the beneficiary, the reason given for requiring the beneficiary to be a party being that the whole matter may be adjusted in one suit and a multiplicity of suits avoided.

An eminent authority expresses the conclusion that, while the early equitable rule was that the beneficiary was always a necessary party in actions relating to the trust, the present position of the courts is that the trustee may represent the cestui que trust in all such actions where there is no conflict of interest between the cestui que trust and the trustee or between the several cestuis que trust. Bogert's, The Law of Trusts and Trustees, Vol. 3, pp. 1872-1878, Sec. 593. Many authorities are cited in support of the text, among them being Cavers v. Sioux Oil & Refining Co., (Tex. Com. App.) 39 S. W. (2d) 862.

In Carey v. Brown, 92 U. S. 171, 23 L. Ed. 469, 470, after stating the general rule that in suits respecting the trust property, brought either by or against the trustees, the cestuis que trust as well as the trustees are necessary parties, and adding that there are several exceptions to the rule, the court said: "One of them is, that where the suit is brought by the trustee to recover the trust property or to reduce it to possession, and in no wise affects his relation with his cestuis que trust, it is unnecessary to make the latter parties." See also Newhouse v. First National Bank (U. S. Dist. Ct.) 13 Fed. (2d) 887, 889, affirmed (U. S. C. C. A.) 17 Fed. (2d) 228.

Other cases hold that the beneficiary is not a necessary party when the instrument creating the trust vests the legal title to the trust property in the trustee and his suit is for the recovery of the property, not for the purpose of disposing of it and closing the trust, but in order that he may thereafter hold, manage and distribute the property agreeably to the trust declared. Anderson v. Stockdale, 62 Texas 54; Bingham v. Graham, 220 S. W. 105, 110.

It is further held that the beneficiary is not a necessary party when the intention to authorize the trustee to prosecute suits in his own name is reasonably manifested by the terms of the trust instrument. Anderson v. Stockdale, 62 Texas 54; Ebell v. Bursinger, 70 Texas 120, 8 S. W. 77; Bingham v. Graham, 220 S. W. 105, 110. It is said that "In such cases the trustee is in court for and in behalf of the beneficiaries; and they,

though not parties, are bound by the judgment unless it is impeached for fraud or collusion between him and the adverse party." Kerrison v. Stewart, 93 U. S. 155, 23 L. Ed. 843, 845.

The trust indenture here involved vests the legal title to the trust property in the trustees and confers upon them full power and authority to sell, grant, convey, assign and lease property belonging to the estate, to collect the proceeds and reinvest the same, and to collect all rents, dividends, interest and all other revenues arising therefrom "and all notes and obligations herein assigned and conveyed or that may arise or accrue in the conduct of said trust." The suit is brought by the present Trustees for the benefit of the trust estate and the beneficiary, Texas Christian University, against former trustees of the estate and other defendants alleged to have acted with them; and the purpose of the suit is to collect from the defendants and restore to the Trust profits that were made by the defendants, and to recover compensation for losses suffered by the Trust, in several loans of trust funds and transactions, which it is alleged, were breaches of trust on the part of the trustee defendants and in which the other defendants participated. The suit is not to wind up or settle the Trust, but it is to collect profits and obligations alleged to belong to it, so that they may be held and used for the purposes intended by the settlor. No conflict of interest between the present Trustees, who bring the suit, and the beneficiary is alleged or shown. The suit in no way affects the Trustees' relation with their cestui que trust.

We believe that under the rules announced by the authorities above cited, and in view of the terms of the trust instrument and the nature and purpose of the suit, the Trustees have the authority to prosecute the suit in their own names and for the benefit of the beneficiary, without making the beneficiary a party. We are further of the opinion that the terms of the trust instrument reasonably manifest the intention to authorize the Trustees to prosecute in their own names a suit of this nature; and in the absence of fraud or collusion between the Trustees and the adverse parties, of the existence of which there is no suggestion, the beneficiary will be bound by the judgment.

The statement is made in the opinion of the Court of Civil Appeals that the record shows that the beneficiary knows that the suit is prosecuted for its benefit by the Trustees and has acquiesced in such action. This statement is not challenged by the defendants in their applications for writs of error, and we find from our investigation of the record that the record supports it. For this additional reason, the beneficiary will be bound

by the judgment, and there is no necessity that it be made a party. Lipsitz v. First National Bank (Com. App.) 293 S. W. 563, 567.

The defendants assign error to the action of the trial court in rendering judgment against them after the jury failed to agree and were discharged, and without notice to them. The following facts are disclosed by the trial court's judgment and a bill of exceptions: After several weeks of testimony, the plaintiffs and the defendants Slay, Simon, Proctor and Longmire filed motions for instructed verdict. The motions of the defendants were overruled and plaintiffs' motion was taken under advisement. Thereupon the court's charge containing more than ninety special issues was submitted to the jury. Three days thereafter the jury reported that they were unable to agree as to any of the issues and they were discharged by the court on July 18, 1942. The plaintiffs, immediately after the jury were discharged, filed a motion for judgment, which was taken under advisement by the court, and on July 24, 1942, a copy of this motion was given to the attorneys for the defendants. On July 30, 1942, the court, without notifying defendants or their attorneys, rendered judgment for the plaintiffs. A copy of the judgment as rendered was immediately delivered to the attorneys for the defendants. The judgment recites that the court is of the opinion that plaintiffs' motion for peremptory instruction should have been granted and that plaintiffs are entitled to a judgment as a matter of law.

■ To support their contention that the court was without authority to render judgment under the circumstances, defendants cite and discuss Hines v. Parker, 128 Texas 289, 96 S. W. (2d) 970, and other authorities construing Article 2211 of the Revised Civil Statutes of 1925 as amended in 1931, being now Rule 301, Texas Rules of Civil Procedure. That statute and rule and those authorities have no application to the question here presented. They relate to the authority of the court to render judgment *after verdict* and notwithstanding the verdict. Here there was no verdict and the judgment was rendered by the court after the jury were discharged and because it was the court's opinion that plaintiffs' motion for peremptory instruction should have been sustained.

■ The statutes and the rules contain no express authority for the procedure which was followed, but they contain no prohibition against it. The judgment rendered was the same judgment that would have been rendered had the court sustained

plaintiffs' motion for peremptory instruction before the case was submitted to the jury. A court is authorized to render judgment without submitting the case to the jury if the facts upon which the judgment is based are supported by undisputed evidence. Adams v. Houston National Bank (Com. App.) 1 S. W. (2d) 878; Clark v. Jones, 164 S. W. (2d) 62. And it is held that the refusal of a court to grant a jury trial, or the rendition of judgment without a verdict from the jury when the case is tried by a jury, is not error, if the judgment is the only judgment that could properly have been rendered on the facts. Caldwell Co. v. Harbert, 68 Texas 321, 4 S. W. 607; American Surety Co. v. Hill Co., (Com. App.) 267 S. W. 265.

While the judgment was rendered without notice to defendants and without further argument than what the court had heard before the jury retired, the record does not show that defendants were prejudiced by the procedure that was followed. They filed motions for new trial which were argued before the court and duly considered.

■ In Handy v. Olney Oil & Refining Co., 68 S. W. (2d) 313, application for writ of error refused, the authority of the trial court to render judgment, under substantially the same circumstances, was sustained in an opinion discussing fully Article 2211 and other articles of the statutes and several authorities. It is our opinion, as was held there, that Article 2211, Rule 301, has no application to the question presented, and that under the rules of decision in this state the trial court had the authority, on undisputed evidence, if it was undisputed, to render judgment after the jury had failed to agree upon a verdict and had been discharged.

The opinion of the Court of Civil Appeals sets out at great length the facts as to the loan made by the Trustees of the Mary Couts Burnett Trust to defendant W. C. Proctor for the purchase of units or interests in the Big Indian Syndicate. Defendants, in their applications for writs of error, do not attack the statement of the facts as made by the Court of Civil Appeals. The fourth point in the application filed by defendants Slay and Simon is that the Court of Civil Appeals erred in holding as a matter of law that they were liable on the Big Indian transaction, giving for the assignment of error thus made several reasons, the substance of which is that the moneys received by said defendants were for legal services rendered to defendant Proctor in lengthy litigation, that the fees for the legal services were contracted for and fixed after the applica-

tion for the loan had been voted upon by the Trustees, that the legal services were in no way in conflict with the interest of the Trust, that there were controverted issues as to intent to defraud and as to conspiracy, and that no damage resulted to the Trust or to the beneficiary.

After carefully examining the evidence referred to in the application for writs of error, the answer thereto and the briefs of the appellants and the appellees in the Court of Civil Appeals, and many pages of the statement of facts, we are convinced that the controlling and material facts established by undisputed evidence with respect to the Big Indian Syndicate loan are correctly stated in the opinion of the Court of Civil Appeals. For this opinion we shall make a somewhat briefer statement of the facts.

Defendant Proctor resided in Dallas, had known defendant Longmire, also a resident of Dallas, for several years and was associated wtih Longmire in "brokerage deals of oil properties." Longmire told Proctor that John Sweatt of Mexia was a trustee of the Mary Couts Burnett Trust and introduced him to Sweatt. Proctor, who was interested in acquiring units of the Big Indian Syndicate and taking its properties out of receivership, asked Sweatt whether the Burnett Trust would be interested in a loan with Big Indian Syndicate interests as security, and Sweatt suggested that he make application to the Trust for a loan. At that time Slay was chairman of the Trustees, and Slay and his partner, defendant Simon, were attorneys for the Trust, Slay receiving from the Trust for his services as trustee $400.00 a month, which was accounted for by him as a part of the income of the partnership, Slay and Simon. The other Trustees were Sweatt, Dr. Chas. H. Harris and Mrs. Ollie Burnett, each of whom received from the Trust as compensation $200.00 per month.

Proctor went to Slay's office about the middle of January, 1936, and began negotiations with him for a loan from the Trust. The testimony of Slay and Proctor shows that there were a number of conferences, at some of which Sweatt was present, that Proctor said he would want to borrow, "he thought" not in excess of $300.00 a unit, and might want to borrow as much as $200,000.00, and that it finally was agreed that if the appraiser's reports were good and the titles were good, the Trustees would loan him "not in excess of $300.00 a unit." Abstracts were submitted and examined by Slay and Simon's firm, and by the end of March, 1936, Proctor was ready to purchase many of the units and wanted the money to pay for them.

The Trustees' minutes of February 19, 1936, contain an entry in substance as follows: That Mr. Sweatt presented to the Trustees the matter of making a loan in connection with the owners and prospective purchasers of units in the Big Indian Syndicate, advising that in connection with Mr. Slay he had gone forward with the negotiations and that abstracts had been submitted and examined; that a lengthy discussion was held as to the merits of the loan, the nature of the security and the possibility of an attractive rate of interest; and that the Trustees evidenced their willingness to go forward and directed Mr. Sweatt to continue his negotiations, looking to the end that a good title be offered before any money should be advanced.

On March 31, 1936, a check on the account of Mary Couts Burnett Trust, signed by defendant Slay, for the sum of $77,-128.10, payable to defendant Proctor, was drawn and delivered to Proctor. At the same time Proctor, signing his name as Proctor, trustee, executed and delivered his promissory note in substantially the same sum, payable to the Trust, due one year from date, bearing six per cent interest, and executed, also as trustee, a deed of trust to secure the note, conveying the undivided interests owned by Proctor, trustee, in two oil and gas leases, one of land in Smith County and the other of land in Rusk County, the property of the Big Indian Syndicate, and also all undivided interests that Proctor might thereafter acquire in that property. The deed of trust provided that it secured any future advances that might be made to Proctor, trustee, by the Trust, and further that in the event the receiver of the Big Indian Syndicate made any division or distribution of proceeds of sale of the property described in the deed of trust or of oil or gas from the property, the proportionate part of such proceeds represented by the undivided interests owned or that might be acquired by Proctor, trustee, should be paid directly to the Trust instead of to Proctor.

On the same day, March 31, 1936, a written agreement, prepared by defendant Simon, was made between Slay and Simon and Proctor, signed by Proctor as trustee, reciting the acquisition by Proctor of undivided interests in the Big Indian Syndicate, the employment by Proctor of Slay and Simon to represent him in connection with matters involved in the purchase of the interests and the litigation concerning same, that Proctor had borrowed money for the purpose of purchasing the interests and contemplated borrowing other sums for the purchase of the same, and that "it is contemplated that profits will be made in said transactions"; and agreeing that Slay and

Simon should represent Proctor in all matters involved in the purchase of the interests and the litigation concerning the same, and for their services should receive as attorneys fees twenty-five per cent of the net profits that might accrue "in whatsoever manner from said transaction." Among other provisions in the written agreement is one that all sums of money borrowed by Proctor, with interest, shall be repaid before any division of the net profits shall be made between the parties to the agreement.

On the same day, March 31, 1936, a letter addressed to Slay and Simon was written by defendant Simon and signed by defendant Proctor. It is as follows:

"With reference to the interests and properties known as the Big Indian Syndicate properties, and certain contracts dated March 31, 1936, involving the properties embraced in said Syndicates, this is to advise you that confirming our oral agreement, regardless and notwithstanding the proportions of profit or interests set forth in said contracts, or any of them, as between yourselves and myself, that all profits, emoluments, commissions, salaries, fees and advantages, whether in money or kind, and of whatever kind or character growing out of said contracts or that may come to either of us, by virtue thereof, shall be divided between us as follows: Three-fourths to you and one-fourth to me."

This letter, however, does not reflect the true agreement of the parties. According to the testimony of the defendants and their acts in making distributions, the true agreement of the parties was that Slay and Simon should receive fifty per cent of the profits, Sweatt twenty-five per cent and Proctor twenty-five per cent. It is further shown by the undisputed evidence that defendant Longmire was interested in the Big Indian Syndicate venture, having a one-half interest in Proctor's part of the profits, this being, as Proctor testified "on account of our partnership in Dallas."

Minutes of the Board of Trustees of the Mary Couts Burnett Trust of date April 10, 1936, reflect the action of the Board as to the payment of $77,128.10 made to Proctor on March 31, 1936. These minutes show that of the four trustees, three were present, Dr. Harris, Sweatt and Slay. The entry, which is approved and signed "W. H. Slay, Trustee, John H. Sweatt, Trustee" is as follows:

"With reference to the Big Indian Oil Company loan, the Trustees discussed this matter in detail and discussed the fact that Mr. Sweatt, Mr. Slay and Dr. Harris, had considered the matter together in private conference and that Mrs. Burnett had been advised in detail as to the nature of same, and that pursuane to the understanding had by Mr. Sweatt, Mr. Slay and Dr. Harris in private conference, the loan had been carried forward and that the title had been approved by the Trust's attorneys and that $77,128.10 had been paid to W. Carl Proctor, Trustee, as first advancement upon the loan; for which a note for said amount secured by deed of trust on the leasehold interest involved was delivered to the Secreary of the Trust, who now holds such note; and that the deed of trust had been forwarded to the County Clerk of Rusk County for filing. These funds were used by the said Proctor for the purpose of purchasing certificates from the Trans-State Oil Company, and others, title to which had been approved at the time said advance was made. Mr. Slay then called attention to the fact that it would be necessary that payment be made for certificates in said company as they were presented, and title to same were approved.

"Whereupon, the Trustees directed and authorized Mr. Slay and the Secretary to draw checks and make payments for certificates when title to same had been approved by the Trust's legal department."

Proctor immediately cashed the check for $77,128.10 that he received on March 31, 1936, used $66,470.57 of the proceeds to pay for units purchased by him in the Big Indian Syndicate, and distributed the remaining $10,657.53 thus: To Slay and Simon $5,328.76; to Sweatt $2,560.00; and to Proctor $2,768.77. This distribution was in harmony with the agreement as to divisions of profits made in the venture, one-half to Slay and Simon and substantially one-fourth to Sweatt and one-fourth to Proctor.

When asked to explain why it was that approximately $77,000.00 was borrowed by him and only approximately $67,000.00 of it used in acquiring the units, Proctor testified that he asked Slay to include in the $77,000.00 check approximately $10,000.00 above what he was paying for the undivided interests so that he, Proctor, would have "some additional funds on hand to carry on with my operations." And he testified further that he told Slay at the time that he "would divide this money up in accordance with the understanding that we had." Slay tes-

tified that when the $77,000.00 check was issued Proctor had purchased "within the allowance of $300.00 per unit"; that he could pay what he wanted to for the units up to $300.00 a unit and if he got $300.00 per unit to buy a certain number of units and they cost him less than $300.00 ."he had a surplus there and can do what he wants to."

Other advancements on the loan were made to Proctor by checks drawn on the account of the Mary Couts Burnett Trust as follows: $4,000.00 on July 13, 1936, $3,000.00 on December 8, 1936, $4,000.00 on April 3, 1937, and $8,500.00 on May 27, 1937. These checks were not used for the purchase of units, but they were immediately cashed by Proctor and the proceeds of them, except the $8,500.00 check, were distributed one-half to Slay and Simon, one-fourth to Sweatt and one-fourth to Proctor. Some of the amounts distributed were not in the exact proportions stated, the differences being accounted for by Proctor's testimony that certain expenses were deducted. The proceeds of these several checks were regarded and treated by Proctor and those to whom he distributed them as surplus or profits above what was required for the acquisition of the units.

On May 27, 1937, when Proctor procured the issuance of the check for $8,500.00, he had bought all, or about all, of the units that he could buy. He told Slay that he wanted this additional loan as a result of the interests that he had bought, and told him, according to his, Proctor's, testimony, that the $8,500.00 was not to be divided at that time, but would be returned out of a distribution that was expected to be made by the Big Indian Syndicate within about two weeks. Proctor had promised to let Sweatt borrow the $8,500.00, with the understanding that Sweatt would be charged with it in the expected distribution from the Syndicate, but he did not tell Slay that the proceeds of the check would be given to Sweatt. The $8,500.00 check was deposited by Proctor to his account on the day it was issued. On the same day Sweatt drew a draft on Proctor for $8,500.00 and on the next day the draft was paid by Proctor's check.

Property of the Big Indian Syndicate in receivership was sold, and on or about June 12, 1937, a distribution of the proceeds of the property sold was made by Sweatt, who had become receiver of the Syndicate, to the holders of units. Payments to the total amount of $174,468.75 were made to Proctor as owner of Syndicate units. Of the amount so received by him be paid to Mary Couts Burnett Trust $138,968.75 to be applied on his debt to the Trust, leaving a balance of $35,500.00

in the hands. Adding to this balance the $8,500.00 that had been advanced to him by the Trust on May 27, 1937, and loaned to Sweatt, Proctor distributed the total of $44,000.00, one-half to Slay and Simon, one-fourth to Sweatt, one-eighth to Longmire and one-eighth to himself. From a second distribution by the receiver of the Syndicate to unit holders Proctor received on or about June 23, 1938, $37,685.25. Of this amount he paid to the Trust on his debt $22,431.04, leaving in his hands a balance of $15,254.21, and this balance he distributed as before, one-half to Slay and Simon, one-fourth to Sweatt, one-eighth to Longmire and one-eighth to himself.

The sum of $174,468.75 received by Proctor in June, 1937, from the first distribution made by the receiver of the Syndicate, was enough to pay in full all that he then owed to Mary Couts Burnett Trust, and the deed of trust that he had executed gave the Trust a first lien on all the Syndicate units that he owned or might thereafter acquire, with provision that any distribution made by the receiver should be paid directly to the Trust instead of to Proctor. Nevertheless, Sweatt, the receiver, made the payment to Proctor and Proctor withheld from it $35,-500.00, leaving a substantial balance due the Trust. The same course was followed with respect to the second payment made by the receiver in June, 1938. Payment was made to Proctor instead of to the Trust. At that time the balance of principal and interest due the Trust was $27,431.04, but Proctor paid to it only $22,431.04, leaving an unpaid balance of $5,000.00.

According to a recital, which has not been attacked by the defendants, in the trial court's judgment, the court found that the unpaid balance due on the loan by the Trust to Proctor in the Big Indian transaction was at the time of the trial $4,079.-00. The trial court rendered judgment for the plaintiffs against the defendants for that amount and also for $80,911.74, the total amount of the profits shared as above shown by John H. Sweatt, deceased, and defendants Slay, Simon, Proctor and Longmire. This part of the judgment of the district court, modified in certain particulars, was affirmed by the Court of Civil Appeals.

■ The very high and very strict standard of conduct which equity demands of one who occupies a position of trust has been the subject of recent decisions by this court. Johnson v. Peckham, 132 Texas 148, 152, 120 S. W. (2d) 786, 120 A. L. R. 720; Kinzbach Tool Co. v. Corbett-Wallace Corp., 138 Texas 565, 160

S. W. (2d) 509. In the first of these two decisions the court said:

"When persons enter into fiduciary relations each consents, as a matter of law, to have his conduct toward the other measured by the standards of the finer loyalties exacted by courts of equity. That is a sound rule and should not be whittled down by exceptions."

The rule is general in its use and is fundamental. It is for the benefit of the cestui que trust and undertakes to enforce the duty of loyalty on the part of the trustee by prohibiting him from using the advantage of his position to gain any benefit for himself at the expense of his cestui que trust and from placing himself in any position where his self interest will or may conflict with his obligations as trusee. United States v. Carter, 217 U. S. 286, 54 L. Ed. 769, 30 Sup. Ct. 515, 19 Am. Cas. 594; Magruder v. Drury, 235 U. S. 106, 59 L. Ed. 151, 35 Sup. Ct. 77; Jackson v. Smith, 254 U. S. 586, 65 L. Ed. 418, 41 Sup. Ct. 200; Crites v. Prudential Ins. Co., 322 U. S. 408, 88 L. Ed. 1356, 64 Sup. Ct. 1075; Fleishhacker v. Blum (U. S. C. A.) 109 Fed. (2d) 543; Cleveland Clinic Foundation v. Humphrys, (U. S. C. C. A.) 97 Fed. (2d) 849, 121 A. L. R. 163; Scott's, The Law of Trusts, Vol. 2, pp. 856-857, Sec. 170, pp. 909-910, Sec. 170,25; Restatement of the Law of Trusts, Vol. 1, pp. 431-441, Sec. 170. The rule extends to every variety of circumstances and has often been applied when a trustee has collected a commission or bonus or has otherwise made a profit for himself out of the property or funds of the trust or in the performance of his duties as fiduciary. A trustee who has received a commission or bonus, or made a profit for himself, under such circumstances is required to account to his beneficiary for it. The profits so made belong to the cestui que trust and for his full protection the cestui que trust may have the use of the constructive trust as a remedy.

"It is a well-settled rule that a trustee can make no profit out of the trust. The rule in such case springs from his duty to protect the interests of the estate, and not to permit his personal interest in any wise to conflict with his duty in that respect. The intention is to provide against any possible selfish interest exercising an influence which can interfere with the faithful discharge of the duty which is owing in a fiduciary capacity." Magruder v. Drury, 235 U. S. 106, 59 L. Ed. 151, 156.

See also the several decisions last above cited and the following: Kinzbach Tool Co. v. Corbett-Wallace Corp., 138 Texas

565, 160 S. W. (2d) 509; Carey v. Safety Deposit & Trust Co., 168 Md. 501, 178 Atl. 242; Driver v. Blakley, 165 Ore. 312, 107 Pac. (2d) 524, 131 A. L. R. 985; Scott's, The Law of Trusts, Vol. 2, pp. 902-906, Sec. 170.22, pp. 1092-1095, Sec. 203; Bogert's, The Law of Trusts and Trustees, Vol. 3, pp. 1505-1507, Sec. 481, pp. 1557-1559, Sec. 492; Restatement of the Law of Trusts, Vol. 1, pp. 553-566, Secs. 205-206; Restatement of the Law of Restitution, pp. 808-812, Secs. 197-199.

The same rule is stated in the text of Perry's Trusts and Trustees, in terms that seem to be very directly relevant to the Big Indian Syndicate transaction. It is:

"Trustees cannot make a profit from the trust funds committed to them, by using the money in any kind of trade or speculation, nor in their own business; nor can they put the funds into the trade or business of another, under a stipulation that they shall receive a *bonus* or other profit or advantage. In all such cases, the trustees must account for every dollar received from the use of the trust-money and they will be absolutely responsible for it if it is lost in any such transaction. * * *

"By this rule trustees may be liable to great losses while they can receive no profit; and the rule is made thus stringent, that trustees may not be tempted from selfish motives to embark the trust fund upon the chances of trade and speculation." Perry's Law of Trusts and Trustees, (7th Ed.) Vol. 1, pp. 714-716, Sec. 429.

■ We shall not undertake to apply the quoted rule in detail to the facts which have been set out above, for it seems that the facts as to the making of the loan to buy units in the Syndicate and the sharing of the profits among the trustees and the others participating fall very clearly under the condemnation of the rule. The trustees loaned to defendant Proctor funds of the Trust in order that he might buy units or interests in the Big Indian Syndicate, then in receivership. Proctor made profits out of this use of the Trust funds and divided profits among Sweatt and Slay who were trustees, Simon, who was attorney for the trust, Longmire, who was Proctor's associate, and himself. On the very day when the first advancement was made on the loan the agreement to divide the profits was made. While the advancement was made to buy interests in the Syndicate, which were the sole security for the loan, a very substantial part of it was not used for that purpose, but was treated by the parties as profits already made, and immediately divided among them. Later, in four instances, the whole of a substantial advancement of the Trust funds, instead of being used to buy units or

interests, was divided, one-half to Slay and Simon, one-fourth to Sweatt, one-eighth to Proctor, and one-eighth to Longmire. When finally Big Indian Syndicate property was sold and distributions of the proceeds were made by the receiver to the owners of units or interests, substantial parts of the payments made to Proctor, which were more than enough to pay the balance of the debt owing to the Trust, were divided in the same proportions among the same parties, and an unpaid balance still owing to the Trust was left.

The parties named engaged in a venture highly speculative in nature, with agreement for division of the profits. Funds of the Trust were loaned and used to make the investment and to enter upon the venture. The Trust had all of the risk of loss and the parties named had all of the opportunity for profit. Each time funds advanced by the Trust were divided as profits instead of being used to purchase units by which the loan would be secured, the security for the loan was depreciated. In loaning the Trust funds and making the advancements and participating in the divisions of the profits, under the circumstances which have been discussed, the two trustees placed themselves in position where their self interests were in conflict with their obligations as trustees. They put the funds of the Trust into a venture in which they were interested, from which they would receive profits if any were made, and out of which they did in fact receive profits, participating with the other parties in the division of the profits. They were, therefore, under the authorities cited, liable to the cestui que trust for all of the profits that were shared. Simon, because he was attorney for the Trust, and he and Proctor and Longmire because they knowingly joined the two trustee defendants in the enterprise, likewise became jointly and severally liable with them for the profits. Flanagan v. Pearson, 42 Texas 1; Brunn v. Hanson, (U. S. C. C. A.) 103 Fed. (2d) 685; 5 Am. Jur. pp. 285-286, Sec. 45; Kinzbach Tool Co. v. Corbett-Wallace Corp., 138 Texas 565, 574, 160 S. W. (2d) 509; Jackson v. Smith, 254 U. S. 586, 65 L. Ed. 418, 41 Sup. Ct. 200; Olin Cemetery Association v. Citizens Savings Bank, 222 Iowa 1053, 270 N. W. 455, 112 A. L. R. 1205; Bogert's, The Law of Trusts and Trustees, Vol. 4, pp. 2521-2530, Sec. 868-869; Scott's, The Law of Trusts, Vol. 3, pp. 1759-1760, Sec. 326, pp. 1773-1775, Sec. 326.5.

■ Two of the reasons assigned by the defendants, to support their contention that the Court of Civil Appeals erred in holding as a matter of law that they were liable on the Big Indian Syndicate transaction, are that there were controverted issues

as to intent to defraud and as to conspiracy and that no damages resulted to the Trust or to the beneficiary because of the loan and the advance payments. These matters, intent to defraud and conspiracy and injury or damage to the beneficiary, are immaterial in the determination of liability in this case. The suit (except the "conspiracy count," on which the judgment was not based) is not an action for fraud or conspiracy. It is well settled that in a suit of this kind recovery may be had by the beneficiary even though he has suffered no damages and even though the trustee may have acted in good faith. Kinzbach Tool Co., v. Corbett-Wallace Corporation, 138 Texas 565, 573-574, 160 S. W. (2d) 509; United States v. Carter, 217 U. S. 286, 54 L. Ed. 769, 775, 30 Sup. Ct. 1515, 19 Am. Cas. 594; Magruder v. Drury, 235 U. S. 106, 59 L. Ed. 151, 156, 35 Sup. Ct. 77; Jackson v. Smith, 254 U. S. 586, 65 L. Ed. 418, 424, 41 Sup. Ct. 200; Crites v. Prudential Ins. Co., 322 U. S. 408, 88 L. Ed. 1356, 64 Sup. Ct. 1075; Fleishhacker v. Blum (U. S. C. C. A.) 109 Fed. (2d) 543, 545-546; Scott's, The Law of Trusts, Vol. 2, p. 903, Sec. 170.22, pp. 1093-1095, Sec. 203; Restatement of the Law of Restitution, pp. 808-809, Sec. 197; Restatement of the Law of Trusts, Vol. 2, pp. 549-552, Sec. 203.

■ The principal defense made by defendants Slay and Simon to the suit against them for profits that they collected out of the Big Indian Syndicate transaction is that they were employed by Proctor to represent him in the receivership proceedings and in litigation incident thereto, and that the payments made to them, except $5,000.00 which was a fee for examining the abstracts of title, were contingent fees earned by them and paid to them by Proctor pursuant to that employment. We have carefully examined all of the authorities cited in support of this defense and find in none of them a state of facts similar to the facts of this case. Most of the authorities cited are cases holding that extra compensation may be paid to a trustee out of trust funds for special services rendered to the trust outside of the trustee's routine work, where the services are of such nature that they are properly chargeable as current expenses of the estate, and for which the trustee might have employed another. Two typical cases are West Texas Bank & Trust Co. v. Matlock, (Com. App.) 212 S. W. 937, and Cornett v. West, 102 Wash. 254, 173 Pac. 44, 46. In the instant case the services of Slay and Simon, for which, as they contend, they were compensated by an interest in the profits, were rendered to Proctor, the borrower; and of course charge could not have been made for these services as current expenses of the estate.

In other cases cited for this defense, in which a trustee was permitted to retain compensation paid to him by a borrower or other person, transacting business with the trust, the facts and circumstances were such that the beneficiary could not be injured by the transaction, or there was no probability of a conflict between the interests of the trust and the individual interests of the trustee, or the beneficiary had consented to the act of the trustee. One of such cases is Donnelly v. Consolidated Investment Trust (U. S. C. C. A.) 99 Fed. (2d) 185; another, Cohen v. Hutchins, 59 App. D. C. 6, 32 Fed. (2d) 397. As to consent by the beneficiary, the established rule is that while a beneficiary's consent to an act of his trustee which would constitute a violation of the duty of loyalty precludes him from holding the trustee liable for the consequences of the act, the beneficiary is not precluded from holding the trustee unless it is made to appear that when he gave his consent the beneficiary had full knowledge of all the material facts which the trustee knew. In re-Trusteeship of Stone, 138 Ohio St. 293, 34 N. E. (2d) 755, 134 A. L. R. 1306; Scott's, The Law of Trusts, Vol. 2, pp, 1149-1153, Sec. 216; Restatement of the Law of Trusts, Vol. 1, pp. 609-619, Sec. 216.

In this case the agreement for division of profits, expected to be realized from the loan of trust funds to Proctor for the purchase of interests in the Big Indian Syndicate, brought the individual interests of the trustee defendants into conflict with the interests of their beneficiary, and there was in the circumstances the probability, at least, of injury to the beneficiary. As to knowledge on the part of the beneficiary, it is shown by undisputed evidence that no disclosure was made of the agreement to divide the profits or of the actual division of anticipated profits. The evidence as to knowledge on the part of the officers of the beneficiary constructed most favorably to the defendants, is that certain of the officers of Texas Christian University knew that Slay and Simon for several years had been examining abstracts of title when loans were made by the Trust and collecting fees from the borrowers for those services.

The share received by defendants Slay and Simon from the profits of the Big Indian Syndicate transaction is not fairly comparable to an ordinary and reasonable fee paid to an attorney for the examination of abstracts. As between Proctor and Slay and Simon the payments were contingent fees for their services to him; but from the viewpoint of the beneficiary, whose interests are of primary importance, the designation of the payments as contingent fees does not change their true

character. They were profits, derived directly and, in part, immediately from loans of the Trust's funds, made to finance a speculative venture in which two of the trustees were interested.

The further argument is made that Slay and Simon's contract with Proctor for contingent fees was made after the application for the loan had been approved by the Board of Trustees and that consequently the vote of the trustees approving the loan could not have been affected by the agreement for fees. There is no merit in this contention. The agreement for division of profits was made on March 31, 1936, the day on which the note and deed of trust were executed by Proctor, and on which the first advancement was made. There is no evidence in the record that, before that time, the Board of Trustees had made any definite agreement or commitment to loan a certain amount of money on specified terms. The entry in the minutes of date February 19, 1936, which is the only evidence of action by the Board before March 31, 1936, merely evidenced the willingness of the Trustees to go forward and authorized Sweatt to continue his negotiations. Moreover, each time an advancement of funds of the Trust was divided as profits instead of being used to acquire units, and each time payments made by the receiver were in part divided as profits instead of being applied to the debt, a conflict of interests arose and was resolved against the beneficiary.

Plaintiffs, the present Trustees, by three separate points in their application for writ of error, complain of those parts of the judgment of the Court of Civil Appeals concerning the Big Indian Syndicate transaction which modify the trial court's judgment by making deduction from it. The first of these points is directed to the deduction of $4,079.00, being the unpaid balance due on the Big Indian Syndicate loan, from the judgment against Slay and Simon. The petition taken by plaintiffs is that this balance represents a loss to the Trust and that the defendants are liable not only for the profits that they made but also for the loss on the loan. It is true that the defendants, on account of their acts in connection with the Big Indian Syndicate loan, would be liable to the cestui que trust for a loss suffered by it on the loan, as well as for the profits made by them. Scott's, The Law of Trusts, Vol. 2, pp. 909-910, Sec. 170.25; Perry's Trusts and Trustees, (7th Ed.) Vol. 1, pp. 714-716, Sec. 429; Bogert's, The Law of Trusts and Trustees, Vol. 3, pp. 2083-2084, Sec. 702. But it is our opinion, after examining the statement of facts, that it was not conclusively proven that the Trust had suffered the loss of the unpaid balance. There is testimony in the record, sufficient to raise an issue of fact, tend-

ing to prove that at the time of the trial there were funds in the hands of the receiver of the Syndicate, allocable to Proctor's interests, on which the Trust has a first lien, which would be more than sufficient, after the disposition of certain other claims, to pay the balance of the debt.

The reason for the deduction by the Court of Civil Appeals of $5,000.00 from the judgment on the Big Indian Syndicate loan is thus stated in its opinion:

"As to the particular items hereinafter named, we do not think the facts are conclusively established so as to make the defendants mentioned liable therefor as a matter of law. $5,000 of the money received by Slay and Simon on March 31, 1936, according to their testimony was received by them as attorneys fees paid by Proctor for their services in examining the title to units in the Big Indian Syndicate. Defendants testified that this fee was agreed upon by a contract separate, distinct and independent of all others and made prior thereto. A jury might conclude that a fee for such purpose was collected by Slay and Simon from the borrower with the knowledge and consent of the trustees and beneficiary. 'A beneficiary who consents to an act or omission by the trustee which would constitute a breach of trust cannot hold him liable for the consequences of the act or omission, if the beneficiary was sui juris and had full knowledge of all relevant facts and of his legal rights and if his consent was not induced by any improper conduct of the trustees.' Scott on Trusts, Vol. 2, p. 1149, Sec. 216."

Plaintiffs argue that it is shown conclusively by the evidence, including the testimony of the defendants, that the contract between Slay and Simon and Proctor for the payment of $5,000.00 for examining the titles was abrogated when the agreement for division of profits was made on March 31, 1936, and that the $5,000.00 was merely a part of the $10,657.53 divided among Slay, Simon, Sweatt and Proctor when the first advancement was made on the loan. There is evidence supporting this contention. However, Simon testified that soon after the examination of the abstracts of title was begun and sometime before March 31, 1936, he and Proctor agreed that Proctor would pay Slay and Simon a cash fee of $5,000.00 for the examination of the titles, that the greater part of this work had been completed by March 31, 1936, that this contract was separate and distinct from the contract for division of the profits made on the day last mentioned, and was not abrogated by the second contract, and that $5,000.00 of the payment made to Slay and Simon by Proctor was in settlement of the agreed cash fee and had noth-

ing to do with the profits. Slay's testimony, while not as explicit as that of Simon, is substantially to the same effect.

■ By this testimony and evidence in the record tending to prove that officers of the beneficiary consented to or acquiesced in a practice of Slay and Simon to examine the titles when loans were made by the Trust and to collect fees for such services from the borrowers, and evidence from which it might be inferred that $5,000.00 was not an excessive fee for the examination of the titles, an issue or issues of fact concerning the $5,000.00 payment were raised for the jury's determination.

The third of the deductions made by the Court of Civil Appeals from the trial court's judgment on the Big Indian Syndicate transaction was a deduction of $328.76 from the judgment against Proctor and Longmire. It clearly appears from testimony of Proctor and Sweatt that this $328.76 was part of the $10,657.53 withheld from the $77,128.10 advanced to Proctor by the Trust on March 31, 1936, which was distributed by Proctor, one-half to Slay and Simon, one-fourth to Sweatt and one-fourth to Proctor. As has been stated, Longmire had a one-half interest in Proctor's part of the profits in the Big Indian Syndicate venture and was paid one-half of that part. Slay and Simon received $5,328.72 from Proctor on March 31, 1936. They testified that $5,000.00 of this payment was for the agreed fee for examining titles. As to the remaining $328.76, they testified that Proctor told them that in purchasing units he got "a discount" amounting to $657.52, and that the $328.76 represented one-half of that discount. In further explanation of this payment they referred to it as "that much profit" and "just a saving as he called it."

We believe that no other reasonable conclusion can be drawn from the testimony of the defendants than that the $328.76 paid to Slay and Simon and the like amount that was divided between Sweatt and Proctor were nothing other than parts of the $10,657.53 withheld on March 31, 1936, by the parties, and divided among them as profits. In our opinion the trial court correctly included the total "discount" or "profit" of $657.52 in the joint and several judgment against the defendants.

■ The facts which form the basis for the judgment rendered against Slay and Simon and Mrs. Sweatt on the Public Service Corporation loan are comparatively simple. That corporation, desiring to borrow about $250,000.00 from the Trust, let it be known that it was willing to pay a ten per cent commission or bonus for the loan. On September 4, 1937, a loan of $275,000.00 was made by the Trust to the corporation. A short time there-

after Horwitz, secretary of the corporation, delivered to Simon two checks, one for $1,500.00 payable to Slay and Simon and one for $23,500.00, the latter being for the commission. The check for the commission was, at Simon's direction and according to Sweatt's request of Simon, made payable to W. R. Adams, who was Sweatt's friend and whose name Sweatt used, according to Adams' testimony, without his consent. Simon delivered the $23,500.00 check to Sweatt, who later gave to Slay and Simon $15,100.00 in two separate payments of $7,600.00 and $7,500.00, retaining the balance, $8,400.00, for himself.

According to the testimony of Simon and Horwitz, the $1,500.00 check was in payment of the fee of Slay and Simon for examining the titles. Simon further testified that he expected Sweatt to pay him and Slay something out of the $23,500.00, but left the amount to Sweatt; that when Horwitz gave him the check for $23,500.00 he told Horwitz that whatever they got out of that check they would apply to their fee for representing the Public Service Corporation in three rate cases then pending and for which no fee had been made up to that time; and that he did represent that corporation in the three rate cases, the trial of which consumed much time, and never sent it a bill for any other or additional fee.

The Court of Civil Appeals modified the trial court's judgment for $25,000.00 in favor of plaintiffs against Slay and Simon and Mrs. Sweatt on this transaction by reducing it, as against Slay and Simon, to $23,500.00. This reduction was made because of the court's conclusion that issues of fact were raised as to whether the $1,500.00 was a legitimate attorney's fee collected from the borrower for examining the title to the security, with the knowledge and consent of the beneficiary.

We approve this part of the judgment of the Court of Civil Appeals. The attack made on it by the defendants in their application for writ of error is substantially the same as that made on the judgment in the Big Indian Syndicate transaction. It is argued that the two payments to Slay and Simon out of the $23,500.00 were a fee for their services as attorneys for the Public Service Corporation in the rate cases. Our opinion is that, according to the undisputed evidence, the $23,500.00 was a bonus or commission paid by the borrower for the loan and that the payments totaling $15,100.00 made by Sweatt to Slay and Simon represented their part of a sharing of that bonus or commission. The crediting of that $15,100.00 by Slay and Simon to the payment of their fee for representing the Public Service Corporation in the rate cases does not alter the fact that the

$23,500.00, of which Slay and Simon received a share of about two-thirds, was a commission made for loaning funds of the Trust. The principles and authorities stated and cited in the discussion herein of the Big Indian Syndicate transaction are applicable to this part of the case. For the reasons given in approving the deduction of $5,000.00 made by the Court of Civil Appeals from the judgment in the Big Indian Syndicate transaction, we approve the conclusion of that court that issues of fact were raised as to the $1,500.00 check given by the Public Service Corporation to Slay and Simon.

The defendants, by assignments of error directed both to the judgment on the Big Indian Syndicate transaction and to that on the Public Service Corporation loan, invoke the doctrine of election of remedies, making the contention that because the Trust received and accepted payment of the principal of its funds that had been loaned, with interest, it cannot require defendants to account to it for the profits and commissions that they made on the transactions. Several authorities are cited which announce the general rule that when a trustee invests trust funds in an enterprise in which he is interested, the beneficiary may, at his election, require the trustee to account either for the original fund, with legal interest, or for the fund as invested, with all profits realized thereon. Murphy-Bolanz Land & Loan Co. v. McKibben, (Com. App.) 236 S. W. 78; Malone v. Kelley, 54 Ala. 532; Fisher v. Fisher, 170 N. C. 378, 87 S. E. 113; Moore v. Rawson, 185 Mass. 264, 70 N. E. 64; Bell v. Hopkins, 268 Mass. 260, 167 N. E. 338.

Several of the cases cited contain merely a statement of the rule as to election of remedies and hold that under the facts the beneficiary was not put to an election. In none of them were the facts similar to those of the instant case. None of them holds that a beneficiary who has received payment, with legal interest, of its funds loaned by the trustee is precluded thereby from requiring the trustee to account for a profit that he has made on the transaction without the beneficiary's knowledge.

The right of election is given to the beneficiary, he being permitted to choose the remedy which is more advantageous to him. The doctrine of election of remedies is not a favorite of equity. It has been said that it "is a harsh, and now largely obsolete, rule, the scope of which should not be extended." Friederichsen v. Renard, 247 U. S. 207, 62 L. Ed. 1075, 1083, 1084, 38 Sup. Ct. 450; 18 Am. Jur. p. 129, Sec. 2. The rule is an application of the law of estoppel, and it is used to prevent

a double redress for a single wrong. Mosher Mfg. Co. v. Eastland W. F. & G. R. Co., 259 S. W. 253, application for writ of eerror refused; 18 Am. Jur. p. 131, Sec. 4. It follows, in our opinion, that the rule should not be applied when the facts of the case are such that its application would, without permitting a beneficiary to have double redress for a single wrong, deny him the benefit of the other equitable rule which gives him the right to require his trustee to account for profits that he has made from the use or loaning of the beneficiary's funds.

■ The principal sums, with legal interest, were repaid to the Trust by the borrowers. The Trust was entitled to the interest for the use of its funds and on the contracts, the notes executed by the borrowers. By the operation of a rule of equity well established, as shown by the authorities which have been cited, the profits and commissions obtained by the defendants become the property of the Trust, even though the Trust may not have suffered any loss. This right is not given to the beneficiary by way of compensation. It does not spring from any contract, but arises out of the trust relation. Boston & C. Smelting Co. v. Reed, 23 Colo. 523, 48 Pac. 515, 518. With these principles in mind, it is at least difficult to reach the conclusion that the collection of interest from the borrowers for the use of the Trust funds and the suit against the Trustees for profits and commissions are inconsistent remedies for one wrong, rather than different remedies for the enforcement of distinct rights. 18 Am. Jur., p. 135, Sec. 11.

For other reasons, however, raised by the facts of this case, the plaintiffs are not concluded by an election of remedies. It has been shown by the statement of the facts concerning the Big Indian Syndicate transaction that the funds of the Trust were loaned to buy units in the Syndicate which eventually were sold at a profit. The funds realized from the sales of the units in 1937 and 1938 were in part used to pay the Trust most of the principal of the debt, with interest, the interest payments thus made amounting to $10,222.48. The balance was divided among the defendants as profits, and the judgment rendered against the defendants was for those profits and other amounts that they had shared as profits. Had part of what was realized from the sale of the units not been used to pay the interest to the Trust, the defendants' profits would have been increased to that extent, and consequently the judgment against them would have been increased to the same extent. The defendants are not subjected to double recovery and there has not been an election of reme-

dies, because they have in effect been credited with what was paid as interest on the loan.

■ Election of remedies is not an inflexible rule. One qualification of the rule is that a party is not concluded by a selection of one of two remedies unless he made it with knowledge, or means of knowledge, of the facts. Richards v. Credit Suisse, 242 N. Y. 346, 132 N. E. 110, 45 A. L. R. 1041, 1044; 18 Am. Jur., pp. 144-145, Sec. 22. When repayments were made of the principal sums, with interest, that had been loaned to Proctor for the purchase of units in the Big Indian Syndicate and to the Public Service Corporation, the beneficiary had no knowledge, either actual or constructive, that two of the trustees and the others acting with them had collected profits and a commission from the loans. It is true that one who has selected a remedy in ignorance of the facts from which his rights arise may not thereafter adopt a different remedy if by that procedure injury is done to an innocent party. Employers' Indemnity Corporation v. Feltner, (Com. App.) 277 S. W. 376. But in this case the judgment requiring the defendants to account to the beneficiary for profits and commission works no injury. The profits and commission belong to the beneficiary, even though by reason of the repayments of the principal, with interest for its use, (assuming full payment of the Big Indian Syndicate loan) the beneficiary has suffered no loss on account of the two transactions.

■ The last assignment in defendants' application for writ of error is that the plaintiffs' cause of action for recovery on the Big Indian Syndicate transaction and the Public Service Corporation loan were not barred by limitation. In presenting the assignment defendants concede, and in our opinion correctly, that limitation began to run when the beneficiary (or as defendants contend, the beneficiary or the co-trustees) knew of the acts of the defendants on which the suit is based or had knowledge of facts which, in the exercise of due diligence, would have led to the discovery of those acts. Allen v. Pollard, 109 Texas 536, 212 S. W. 468; Wichita Royalty Co. v. City National Bank, 127 Texas 158, 89 S. W. (2d) 394, 93 S. W. (2d) 143; Fleishhacker v. Blum, (U. S. C. C. A.) 109 Fed. (2d) 543, 548.

It is shown by undisputed evidence that neither the beneficiary nor the co-trustee knew, until less than two years before suit was filed, that the defendants had made and shared profits from the Big Indian Syndicate loan or that they had been paid a bonus or commission on the Public Service Corporation loan.

After careful consideration of the evidence relied upon by defendants to raise the issue of constructive knowledge, we agree with the conclusion of the Court of Civil Appeals that the evidence fails to show facts sufficient to put the beneficiary, or even the co-trustees, on inquiry. The evidence relied upon consists in the main of testimony as to knowledge on the part of one or more of the officers of the beneficiary and on the part of the co-trustees that it was the custom of Slay and Simon to examine titles in connection with loans made by the Trust and to collect attorneys' fees from the borrowers, and of the existence of rec-orders in the office of Trust showing the issuance by the Trust of two checks, one for $472.69 and another for $135.00, with notations indicating that they were used by Slay and Simon for expenses in the Big Indian Syndicate litigation. We do not believe that knowledge of facts of this nature could reasonably have caused officers of the beneficiary, or the co-trustees, to suspect that the defendants had engaged or were engaging in the distinctly different conduct on account of which this suit was brought.

■ Plaintiffs complain of that part of the judgment of the Court of Civil Appeals which reversed the trial court's judgment for $14,000.00 against Slay, Simon and Proctor on the Great Plains Oil & Gas Company transaction. On April 18, 1936, $200,000.00 of the Trust's funds were loaned to the Great Plains Company and secured by lien on its oil and gas properties in the East Texas field. The loan was subsequently paid in full. Negotiations for the loan had their beginning when Proctor, learning that Cloud, president of the Great Plains Company, was anxious to borrow money, told Cloud he would send him to a place where he thought he could get the money. Thereupon an agreement was made between Proctor and Cloud that for obtaining the loan Proctor would be paid a commission of fifteen per cent, out of which he would take care of all expenses. Proctor told Cloud to go to Slay and make application for the loan.

Cloud talked to Sweatt about the loan and Sweatt agreed to investigate the property. Sometimes in February or March, 1936, Cloud visited Simon and told him that he intended to apply for the loan and consulted him about the suit pending in the United States District Court in which a receiver of the property of the Great Plains Company had been appointed, and also about controversies he was having with some of the stockholders. In the course of the conversation an agreement was reached between Cloud and Simon whereby Cloud employed

Slay and Simon to represent the Great Plains Company in the receivership suit and in all controversies in connection with it, and also to examine the titles and do what was necessary to cure any objections to the titles. For all of these services Cloud agreed to pay to Slay and Simon a fee of $10,000.00.

Cloud went from Simon's office to Slay's office and asked him about borrowing money. Later the application for the loan was approved and the loan made. A short time thereafter Cloud again went to Simon's office and gave him $13,000.00, telling him he had obligated himself to pay Mr. Adams $5,000.00 "in connection with the work, and that he wanted him to take the $13,-000.00, which was all the money he had, and use it for payment of his fee and to pay Adams. Simon insisted that his fee was $10,000.00. Finally, Cloud gave Simon his note payable to Slay and Simon for $1,000.00 and told him to take the $13,000.00 and get his $10,000, if he could work it out. The $1,000.00 note was paid.

Sweatt, who was using Adams' name in this, as well as in the Big Indian Syndicate transaction, called upon Simon and asked for the $5,000.00 and was told by Simon that Cloud had left only $4,000.00 for him. After some discussion Sweatt and Simon reached an agreement by which they divided the $13,000.00 that Cloud had left, two-thirds or $8,666.66 to Slay and Simon, and one-third or $4,333.33 to Sweatt. Sweatt gave one-half of the $4,333.33 to Proctor.

Proctor also received for payment of his commission in procuring the loan $19,100.00. He paid a Dallas law firm $100.00 for services rendered, and the $19,000.00 was divided between Proctor and Sweatt, one-half to each. Proctor and Sweatt concealed from Slay and Simon the facts as to the $19,000.00 payment, Proctor testifying that as long as they knew nothing about it they could not make demands for part of it.

The $19,000.00 was a commission paid for the loan of the Trust funds, and Proctor and Sweatt clearly were liable to the plaintiffs for it. The $4,333.33 left by Cloud with Slay and Simon, paid by them to Sweatt and divided between Proctor and Sweatt, was also part of the commission. Proctor and Sweatt became liable to the plaintiff for that amount because they received it, and Slay and Simon also became liable to the plaintiffs for that amount because they participated in its payment to Sweatt. There is testimony in the record that Sweatt spent a few days in inspecting the property of the Great Plains Com-

pany, but there is no evidence of extraordinary services beyond what might be expected of him as a paid trustee, and the payments made to him were grossly excessive in comparison with the extent and value of his services. In our opinion no other reasonable conclusion can be reached than that the payments to Sweatt represented merely parts of his part of the commission for the loan.

As to the payments made to Slay and Simon and retained by them, the total sum of $9,666.66, it is our opinion, after reading all of the evidence concerning the Great Plains transaction, (to use the language of the Court of Civil Appeals) "that the evidence raises questions of fact as to whether they were legitimate fees of the type habitually collected by them with the knowledge and consent or acquiesence * * * of the beneficiary." We have given careful consideration to plaintiffs' argument and discussion of the facts and circumstances in evidence, as showing that the payments to Slay and Simon of approximately $10,000.00 for their services in examining the abstracts and clearing the titles and in the receivership suit were exorbitant and unreasonable as a matter of law, and that these payments were in truth their part of a division of the commission that Cloud had agreed to pay to Proctor for the loan. Our duty is to determine whether there is any evidence sufficient to raise issues for the jury as to these questions, and we believe the following testimony of Simon raises such issues: The property was tied up in a receivership suit and Cloud, without success, had been endeavoring to "get rid of the receivership." Cloud was having controversies with stockholders of the company, some of whom lived in other states. The property was highly valuable, being in what was called the "Fair Way" of the East Texas oil field, and its owners could not explore and develop it fully with the receivership pending. The titles in that part of the state were tedious and difficult and much time was required for their examination. His firm did a vast amount of work in preparing for the hearing in the receivership suit and in working out with the court and the creditors a plan whereby all could be satisfied and the property taken out of the hands of the receiver. The loan was made and a result obtained that was satisfactory to Cloud, the property being turned back to him. The $10,000.00 fee that Cloud agreed to pay for their services as attorneys was to be paid whether the loan was made or not. Another attorney associated with Slay and Simon testified to the great extent of their services in examining the abstracts and clearing the titles and in obtaining disposition of the receivership.

The trial court's judgment on the Great Plain Company transaction should be affirmed as to the $19,000.00 adjudged against Proctor and Mrs. Sweatt and as to $4,333.33 of the $14,000.00 adjudged against all of the defendants. It should be reversed as to $9,666.66 of the said $14,000.00 in so far as it is against Slay, Simon and Proctor, and affirmed as to that item in so far as it is against Mrs. Sweatt, who did not appeal.

It should be added that the rulings made concerning election of remedies and limitation, in discussing assignments of error directed to the judgments on the Big Indian Syndicate transaction and the Public Service Corporation loan, apply also to the plaintiffs' suit arising out of the Great Plains Company transaction. And the rulings made as to limitation apply also to the plaintiffs' suit arising out of the Lynch, Longmire and Nantz-Wood loans hereinafter discussed.

The facts as to the Lynch loan, which fall into a familiar pattern, will be briefly stated. A. E. Lynch, who owned the leasehold interest in certain tracts of land in Ward County, told Proctor that he wanted to borrow $100,000.00 or more, to be secured by lien on that property, and agreed to pay Proctor a commission of $10,000.00 for procuring the loan, out of which Proctor was to pay any expenses. Proctor advised Lynch to make application to Slay for the loan. Slay was told by Proctor that Lynch had agreed to pay him $10,000.00 for procuring the loan, this payment "to cover everything," and Proctor and Slay agreed that Proctor should pay Slay and Simon $5,000.00 for the title examination expenses. After application for the loan was made Sweatt, who had been requested to make investigation of the property, was told by Proctor that he was getting a $10,000.00 commission and would pay him $2,500.00 for making the investigation. Proctor testified that he started out with a $10,000.00 commission and had to pay out of it $5,000.00 to Slay and Simon for passing on the title and $2,500.00 to Sweatt for examining the property, which left him only $2,500.00 He testified further that he felt more or less obligated to pay Sweatt half of any commission he was making at that time because they "were working together on a number of deals on a fifty-fifty basis."

The abstracts were examined and investigation made, and on August 14, 1937, the loan for the total sum of $200,000.00 was consummated. On that day the Trust's check for $125,000.00 was issued to Lynch, the balance of the total amount loaned being paid to him later. The check for $125,000.00 was

cashed on the day it was issued, and on the same day $5,000.00 was paid to Slay and Simon and $5,000.00 to Proctor, and Proctor paid Sweatt's drafts, one for $1,500.00 and one for $1,000.00.

The trial court rendered judgment against defendants Slay, Simon, Proctor and Mrs. Sweatt for the $10,000.00 commission and for $136,288.71, which was found to be the Trust's loss on the loan. The Court of Civil Appeals reversed the judgment except as against Mrs. Sweatt, who did not appeal, holding that there was evidence sufficient to raise issues of fact with respect to the question of attorney's fees and as to the amount of the loss suffered by the Trust in the transaction. Plaintiffs do not assign error to the reversal of the judgment for $136,288.71, but they attack the reversal of the judgment for $10,000.00, contending that the $10,000.00 was a commission paid to Proctor for the loan and shared with the other defendants.

In our opinion, the judgment of the trial court for $10,000.00 should be affirmed. According to the undisputed evidence, including the testimony of Sweatt, Proctor and Slay, that amount represented the commission that the borrower agreed to pay, and did pay, for the loan, and when the commission was paid it was divided among the defendants. Thus the defendants, who occupied positions of trust, directly received part of a bonus or commission paid for the loan of the beneficiary's funds and directly profited from the transaction. There is no evidence, as there was concerning other transactions, tending to prove that an entirely separate and distinct contract was made by the borrower for the payment by him of a fee for legal services. The agreement for the total commission of $10,000.00 was made by Proctor and he shared it with Slay and Simon and Sweatt in amounts that were grossly in excess of the value of the service rendered.

Another transaction, a loan made on July 7, 1939, to Texoil Producers, Inc., of which A. E. Lynch was president, is in many particulars like the loan to Lynch. Proctor had no connection with this loan. The arrangements for it were made by Lynch or his associate, Simmons, with Slay and Sweatt. The commitment was for a loan of $125,000.00. Slay and Sweatt testified that Simmons agreed to pay a total of ten per cent on the loan to cover investigation of the property and any expenses in connection with the loan, and Slay testified further that he told Simmons the fee of Slay and Simon would be $6,500.00. The total amount actually loaned was $95,000.00, of which $82,000.-00 was advanced by the Trust on July 7, 1939. The Trust's check

to Texoil Producers, Inc., was cashed on the same day, and Simmons gave to Slay a check for $1,250.00 and $7,500.00 in cash, telling him that the cash was to be paid to Sweatt, but he wanted to leave it in the name of W. R. Adams, and further that Sweatt would see him "and then you can work it out, but I don't want to spend more than ten per cent, to cover everything." In a few days Sweatt and Slay discussed the division of what Simmons had paid. Sweatt was claiming one-third for his services in connection with the loan and Slay was insisting upon $6,500.00 as his fee. They reached an agreement by which Sweatt was paid in cash $2,833.33 and the balance of what Simmons had paid was retained by Slay, being approximately one-third to Sweatt and two-thirds to Slay and Simon. About five weeks later Simmons made another payment of $1,250.00 in cash to Slay and Simon, of which $833.33 was retained by them and $416.67 paid to Sweatt. Slay and Simon paid a fee of $250.00 to Oklahoma attorneys for examining the title.

The trial court rendered judgment against Slay, Simon and Mrs. Sweatt for the $9,750.00 received by them and shared with Sweatt in the Texoil Producers, Inc. loan, and for $92,-432.11 as loss on the loan. The Court of Civil Appeals reversed the judgment as to Slay and Simon, holding that there were issues of fact. It is our opinion that, for the reasons given above in discussing the judgment on the Lynch loan, the trial court's judgment for $9,750.00 on this loan should be affirmed.

On June 29, 1938, the Trust loaned to defendant Longmire $27,000.00, for which he executed his promissory note. The loan was made to enable Longmire to buy from one Verser one-fourth of a one-eighth royalty interest in 80 acres of land in Oklahome. It was secured by assignments of that interest. Longmire negotiated with Sweatt and Slay for the loan. While the application for the loan was pending Verser told Simon that he had agreed with Longmire to pay whatever expenses there were, including the attorney's fees for examining the titles, and Simon and Verser agreed that the latter would pay $2,000.00 "to cover everything." According to Simon's testimony the $2,000.00 agreed upon "covered everything that had to be paid out whether it was to anybody else in connection with the matter or any commissions that had to be paid or whatever had to be paid out by him (Verser)." Simon testified that under this agreement with the seller he was passing on the validity of the seller's title for the borrower and for the Trust. He testified further that after his conversation with Verser, Sweatt came to see him and told him he was doing some work in connection with the trans-

action and had been promised that he would be paid for his services, and that he and Sweatt tried to fix the amount that Sweatt should receive at about what had been done in the Great Plains matter, that he did not know whether it was his, Simon's, suggestion, or Sweatt's that "we split it up that way," but at least that was done.

The application for the loan was passed upon favorably at a metting of the Board of Trustees, and Sweatt and Slay were directed to consummate the loan when the title and all things were approved and made satisfactory to them. When the loan was consummated Verser paid $2,000.00 to Slay and Simon, who retained $1,333.33 of it and paid the remaining $666.67 to Sweatt. Of the $27,000.00 loaned to him, Longmire used $22,000.00 to pay Verser for the assignment of the royalty interest and he paid to Sweatt $2,500.00. Longmire testified that Sweatt approached him for a loan of $2,500.00 on the day he got the $27,000.00 from the Trust, and that he gave him the money as a loan and took his note for it.

The trial court rendered judgment against Slay, Simon, Longmire and Mrs. Sweatt for the $2,000.00 divided between Slay and Simon and Sweatt, and also for $24,400.00 representing the balance of the principal due on Longmire's note to the Trust, towit, $27,000.00, after crediting thereon the value of the royalty interest. The trial court also rendered judgment against Longmire for $1,977.67 as interest on the loan and judgment against Longmire and Mrs. Sweatt for $2,500.00, the amount paid by Longmire to Sweatt. The Court of Civil Appeals reversed the whole of the judgment on the Longmire loan, except as against Mrs. Sweatt. We approve the judgment of the Court of Civil Appeals on this loan, except as to the $2,000.00 adjudged against the four defendants. That part of the judgment should be affirmed. The payment of the $2,000.00 and its sharing are in substance the same as the payment and sharing of the $10,000.00 in the Lynch loan and the payment and sharing of the $9,750.00 in the Texoil Producers, Inc., loan. The testimony of Longmire that his payment of $2,500.00 was a loan, requested and made after the loan to him by the Trust was consummated, makes an issue of fact as to the bona fides of that payment.

Plaintiffs made the contention that instead of reversing judgment against Longmire for $24,400.00, as loss on the loan to him, and remanding that part of the suit, the Court of Civil Appeals should have rendered judgment against him for $28,977.67, being the principal and interest past due and unpaid on

his promissory note. We cannot hold that the Court of Civil Appeals erred in failing thus to reform the judgment, because the trial court's judgment for the loss on the loan, computed by crediting the value of the security on the principal of the debt, followed the plaintiffs' petition which sought recovery of that loss rather than of the principal and interest on the note. On another trial the plaintiffs may, if they desire to do so, amend their pleadings so as to sue Longmire for the principal and interest due on the note rather than for a loss represented by the difference between the amount of the debt and the value of the security.

In May, 1939, the Trust made a loan to Nantz and Wood for $11,500.00, secured by one-half of the leasehold interest in a tract of land in Brazoria County. Slay testified that while the papers for the loan were being prepared he told Nantz that Slay and Simon's attorneys' fees would be, according to his recollection, $1,000.00 or $1,100.00. The first advancement on the loan to Nantz and Wood was made by the Trust's check to Nantz for $1,400.00, dated May 6, 1939. A short time thereafter Nantz paid to Slay $400.00, saying that he would return in a few days. When Nantz returned he was accompanied by Sweatt. He gave Slay $1,000.00 and told him that Sweatt had gone to Brazoria County and looked into the property and that he was going to pay him something. He said: "Here is a thousand dollars. You fellows make the division you want to." The $1,000.00 was divided, one-third to Sweatt and two-thirds to Slay and Simon. No part of the $400.00 was given to Sweatt. The trial court's judgment against Slay and Simon, by the Court of Civil Appeals. was reversed, as to Slay and Simon, by the Court of Civil Appeals.

After hearing all of the evidence concerning the Nantz-Wood loan, we are convinced that no other conclusion can reasonably be drawn from the evidence than that the $1,000.00 was a commission or profit paid by the borrower and shared by Slay and Simon and Sweatt, the same in its nature as other shared profits above discussed and for which the defendants have been held liable. As to the $400.00 payment made to Slay and not shared with Sweatt, there is evidence from which it might be inferred that it represented a fee paid by the borrower for the examination of the abstracts, not unreasonable in amount, and in accordance with a practice known and acquiesced in by the beneficiary.

We agree with the Court of Civil Appeals that no reason is shown for reversal of the judgment for $143,730.98 rendered

against Proctor on the loan made to him and secured by Ward County property. Appellants brief in the Court of Civil Appeals contains no assignment of error presenting the contention that there was evidence raising an issue or issues of fact in that part of the suit, or the contention that the pleadings and evidence do not support the judgment rendered.

Since the error in the trial court's judgment, as pointed out herein and in those parts of the opinion of the Court of Civil Appeals which we have approved, affect parts only of the matter in controversy and the issues are severable, the cause is remanded only for new trial of the parts of the suit affected by those errors. The judgment of the Court of Civil Appeals is in part affirmed and in part reversed, the effect of this judgment being that the trial court's judgment is in part affirmed, in part modified and affirmed, and in part reversed, and the cause is remanded to the district court only for new trial of the issues affected by the errors in its judgment. This court's disposition of the cause is set out with particularity in the judgment this day entered herein, which for the sake of clarity and brevity, is expressed by reference to the judgment of the district court.

The costs incurred by reason of the appeal to the Court of Civil appeals are taxed against the appellees in that court, who were the plaintiffs in the trial court, and the costs in this court are taxed against the defendants Slay, Simon, Proctor and Longmire.

Opinion adopted by the Supreme Court April 25, 1945.

Rehearing overruled May 30, 1945.