Alice O. McGehee EASTMAN et al.,
Appellants,

v.

Dallas C. BIGGERS et al., Appellees.

No. 17106.

Court of Civil Appeals of Texas.

Dallas.

July 12, 1968.

Rehearing Denied Nov. 15, 1968.

Jackson C. Burroughs, Dallas, for appellants.

Arch A. Beasley, of Biggers, Baker, Lloyd & Carver, Dallas, Gene Caldwell, Tyler, Foster T. Bean, Kilgore, for appellees.

DIXON, Chief Justice.

On May 22, 1967 appellant Alice O. McGehee Eastman, joined as plaintiff by her husband, filed suit against Dallas C. Biggers and other defendants for alleged fraud committed in the year 1937—thirty years prior to the time of the filing of the suit. Appellants seek actual damages in the approximate amount of $400,000 and exemplary damages of $500,000.

Mrs. Eastman charges that in 1937, Dallas Biggers, who was then employed by her as her attorney-at-law, entered into a conspiracy with L. J. Wardlaw and J. J.

Jenkins to conceal from her and they did conceal from her the fact that she owned an interest in Lots Nos. 1, 2 and 3, Block 117, in the Townsite of Kilgore, Gregg County, Texas, which was and is valuable oil property.

Wardlaw and Jenkins are both deceased. Their heirs, beneficiaries and representatives are named as defendants. They will be referred to as the Wardlaw Group and the Jenkins Group.

In 1937 appellant was Mrs. Alice O. McGehee, widow of Frank K. McGehee. In June of 1939 she married E. F. Eastman, her present husband.

Mrs. Eastman alleges that in 1937 she knew that as the widow of Frank K. McGehee she owned an interest in Lots 4 to 11 inclusive in Block 117 in the Townsite of Kilgore, Texas, on which property producing oil wells were being operated. L. J. Wardlaw, as agent of the owners, was operating the oil lease on said property. Mrs. Eastman, then Mrs. McGehee, became dissatisfied with Wardlaw's operation and employed Dallas Biggers to investigate. Biggers discovered that Frank K. McGehee had also acquired an interest in Lots 1, 2 and 3 in the same Block 117. Title to this interest had been placed in the name of W. B. Pearce as trustee for McGehee. According to Mrs. Eastman, Biggers concealed the fact that she owned an interest in Lots 1, 2 and 3 and entered into a conspiracy whereby J. J. Jenkins was to be shown as the owner of said interest.

Biggers, in both his pleadings and in a deposition denies that he was guilty of any fraud in representing Mrs. Eastman. He further pleads the two and four year statutes of limitations, Articles 5526 and 5529, Vernon's Ann.Civ.St.; and also that on February 20, 1941 for a valuable consideration, Mrs. Eastman and her husband executed a written release of all her causes of action, claims and demands whatsoever against Biggers.

The Wardlaw Group and the Jenkins Group, nonresident defendants, filed pleas of privilege. Appellants controverted said pleas.

Biggers filed a motion for summary judgment. The court sustained the motion and entered judgment in favor of Biggers. The court then sustained the pleas of privilege of the Wardlaw Group and the Jenkins Group.

Appellants have taken an appeal from both the summary judgment and the orders sustaining the pleas of privilege.

## APPEAL FROM SUMMARY JUDGMENT.

### A. LIMITATIONS.

In their first point of error appellants attack the holding of the court that appellants' cause of action was barred by the statutes of limitation.

The record includes the pleadings of the parties and the depositions of Biggers, Mrs. Eastman and her husband, E. F. Eastman.

Mrs. Eastman's position is that she did not know in 1937 that she owned an interest in Lots 1, 2 and 3 and that she did not learn that she owned said interest until the year 1965 when her son learned of it in the course of an inquiry into other matters; and that under the circumstances she did not fail during the intervening years to exercise reasonable diligence to discover the fraudulent concealment practiced by Biggers, Wardlaw and Jenkins. This suit was filed within two years after she says she learned of the fraud in 1965.

We agree with appellants that the legal principles applicable to cases of fraudulent concealment and the statutes of limitation are as follows:

1. Fraud prevents the running of limitations until (a) the fraud is discovered, or (b) "by the exercise of reasonable diligence might have been discovered."

2. Where a fiduciary relationship exists between the parties, such as that between attorney and client, diligence does not exact as prompt and searching an inquiry into the conduct of the attorney as if the parties were strangers, or were dealing with each other at arm's length. However the fact that a fiduciary relation exists does not justify a party in neglecting every precaution until something occurs to arouse his suspicions.

Many authorities could be cited in support of the above legal principles, but we shall cite only a few: Polk Terrace, Inc. v. Curtis, 422 S.W.2d 603, 605 (Tex.Civ. App., Dallas 1967, writ ref'd n. r. e.); Courseview, Inc. v. Phillips Petroleum Co., 158 Tex. 397, 312 S.W.2d 197, 204–205 (1958); Sherman v. Sipper, 137 Tex. 85, 152 S.W.2d 319, 137 A.L.R. 263 (1941); Boren v. Boren, 38 Tex.Civ.App. 139, 85 S.W. 48 (Tex.Civ.App., Dallas 1905, writ ref'd); Bass v. James, 83 Tex. 110, 18 S.W. 336 (1892); Cooper v. Lee, 75 Tex. 114, 12 S.W. 483 (1889); 37 Tex.Jur.2d 202–207, 208; 34 Am.Jur. 129, 135; 54 C.J.S. Limitations of Actions §§ 184, 189, pp. 175, 188.

■ The undisputed facts in this case when tested in accordance with the above principles impel us to conclude as a matter of law that Mrs. Eastman either knew, or in the exercise of reasonable diligence should have discovered the alleged fraud of Biggers more than four years before she filed this suit in 1967. The trial court properly sustained Biggers' plea of limitation.

The undisputed facts on which we base our conclusion are as follows:

1. On February 28, 1938 W. B. Pearce executed a conveyance to Mrs. Alice O. McGehee of an undivided one-half interest in and to Lots 1, 2 and 3 of Block 117, of the Town of Kilgore. This conveyance was recorded in the Deed Records of Gregg County, Texas, on March 3, 1938.

2. On June 3, 1938 Mrs. Alice O. McGehee, for a consideration of $2,750 agreed to sell and assign to Biggers her interest in the above Lots 1, 2 and 3. Appellant admits she signed the agreement and that she retained a copy of it which was still in her possession in 1967.

3. In September 1938 Mrs. McGehee became dissatisfied with the services of Biggers as her attorney. She testified that she had lost confidence in him. Their relationship as attorney and client was terminated by Mrs. McGehee in December 1938.

4. Appellant admits that she executed an assignment to her son, Frank B. McGehee, in 1957 of an interest in Lots 1, 2 and 3, which assignment was recorded in the Deed Records of Gregg County. She stated in said assignment that she was the owner of part of the working interest in leases under Lots 1, 2 and 3.

5. In 1957 she filed with the United States Government a gift tax return in which she stated that she had given her son one-fourth of her interest in oil and gas leases as well as lease and well equipment on Lots 1, 2 and 3.

6. In 1958 she filed another gift tax return containing recitations of another gift to her son of an interest in Lots 1, 2 and 3.

In their brief appellants stress the fact that at the time the alleged fraud was perpetrated the fiduciary relationship of attorney and client existed between Biggers and Mrs. McGehee (Eastman) hence the latter is to be excused for not sooner discovering the fraud. We find ourselves unable to agree with appellants.

The fiduciary relationship ended in 1938. Mrs. Eastman had lost confidence in Biggers. Their relationship became unfriendly and adversary. Mrs. Eastman shopped around for attorneys to represent her in pressing her claims against Biggers. She succeeded in obtaining the services of E. W. McMannis, her uncle, an attorney of the State of Iowa, in whom she had complete confidence. McMannis came to Dal-

las. He was present when the settlement and release agreement was concluded in 1941. The short-lived fiduciary relationship between Biggers and Mrs. Eastman will not avail Mrs. Eastman for her failure for the next twenty-nine years to discover the alleged fraud.

■ The means were at ·hand for Mrs. Eastman readily to have discovered the alleged fraud long before the four year period preceding her filing of this suit. Mrs. Eastman says that she signed without reading the several documents enumerated earlier in this opinion. In all of them she asserted an interest in Lots 1, 2 and 3. The law does not permit a person to close his eyes to facts which would put him on inquiry in the exercise of reasonable diligence to discover fraud. The Deed Records of Gregg County were open to Mrs. Eastman for her inspection. They constitute constructive notice of her claim of title. Sherman v. Sipper, 137 Tex. 85, 152 S.W.2d 319, 321, 137 A.L.R. 263 (1941); Boren v. Boren, 38 Tex.Civ.App. 139, 85 S.W. 48 (Tex.Civ.App., Dallas 1905, writ ref'd). Moreover it must be remembered that for twenty-nine years prior to the filing of suit Mrs. Eastman had in her exclusive possession the written contract dated June 3, 1938 by the terms of which she agreed to sell Biggers her interest in Lots 1, 2 and 3 for a consideration of $2,-750. See Cooper v. Lee, 75 Tex. 114, 12 S.W. 483 (1889).

Appellants' first point of error is overruled.

## B. SETTLEMENT AND RELEASE.

■ In their second point of error appellants assert that the written settlement and release agreement of February 20, 1941 did not include the fraud which is the basis of this suit. Again we must disagree with appellants.

The settlement and release agreement was executed and acknowledged before a notary public by Mrs. Eastman and her husband with the written approval of her attorney, E. W. McMannis.

The instrument is general in its terms. In consideration of an overriding oil interest conveyed by Biggers to Mrs. Eastman the latter released Biggers "completely and fully" from "any and all causes of action, claims and demands of every kind or nature whatsoever which we, or either of us, *now have or may hereafter have * * * growing* out of or which might *grow out of any and all transactions and sales* heretofore had between Dallas C. Biggers and the parties hereto, or either of them." (Emphasis ours.)

Appellants say the release does not include Biggers' alleged fraudulent concealment of her interest in Lots 1, 2 and 3 because at the time she signed the release she had not yet discovered that she owned an interest in the three lots. Yet at the time she signed the release she had in her possession a signed copy of the contract whereby she agreed to sell Biggers her interest in Lots 1, 2 and 3. This certainly comes within the category of "transactions and sales heretofore had" with Biggers.

There was also on record at the time a deed from W. B. Pearce (who had acted as trustee for Mrs. Eastman's husband in taking title to the property) to Mrs. McGehee (Eastman) conveying title to a one-half undivided interest in Lots 1, 2 and 3.

■ Mrs. Eastman says that she did not read the instrument before signing it. This is not a valid reason for setting the release aside. There is no showing that anyone tried to prevent her reading it. At this time no fiduciary relationship existed between Mrs. Eastman and Biggers. Thigpen v. Locke, 363 S.W.2d 247, 251 (Tex.Sup. 1962); Indemnity Ins. Co. v. W. L. Macatee & Sons, 129 Tex. 166, 101 S.W.2d 553, 556 (1937). Moreover, Mrs. Eastman had the benefit of the services and advice of her own attorney, E. W. McMannis. We think the court properly held that the settlement and release agreement included and concluded Mrs. Eastman's claims

against Biggers with respect to Lots 1, 2 and 3. Rough v. Southwestern Bell Telephone Co., 426 S.W.2d 579 (Tex.Civ. App., Dallas 1968, writ ref'd); Dial Temp Air Conditioning Co. v. Faulhaber, 340 S. W.2d 82 (Tex.Civ.App., Dallas 1960, writ ref'd n. r. e.); Posey v. Posey, 386 S.W.2d 884 (Tex.Civ.App., Fort Worth 1965, no writ); 2 Tex.Jur.2d 629–630. Appellants' second point of error is overruled. The court properly rendered summary judgment in favor of Biggers.

## APPEAL IN RE PLEAS OF PRIVILEGE.

■ In their third and fourth points of error appellants complain of the court's orders sustaining the pleas of privilege of the Wardlaw Group and the Jenkins Group.

In their controverting pleas appellants seek to invoke Subdivisions 4 and 29a of Art. 1995, V.A.C.S. to retain venue in Dallas County as to the nonresident defendants. For these subdivisions to be applicable it was necessary for appellants to prove their cause of action against the resident defendant. Gray v. Gulf Oil Corp., 416 S.W.2d 875 (Tex.Civ.App., Fort Worth 1967, no writ). By overruling appellants' first and second points we have held that appellants do not have a cause of action against Biggers, the resident defendant. It follows that Subdivisions 4 and 29a are not available to appellants to retain venue in Dallas County. Appellants' third and fourth points are overruled.

The judgment of the trial court is affirmed.

## ON REHEARING

In a motion for rehearing 137 pages in length appellants earnestly plead that in our main opinion we were mistaken both as to the law and the facts in this case.

Appellants say that we have misconstrued the holding of our Supreme Court in Courseview, Inc. v. Phillips Petroleum Co., 158 Tex. 397, 312 S.W.2d 197. The above case was cited by appellants in their brief and by us in our opinion.

In *Courseview,* which involved a relationship of trust and confidence, the Supreme Court held that under the particular facts of that case there was no legal duty on the part of the defrauded party to use the means available for discovering the fraud which had been perpetrated; and that consequently limitations had not run against the plaintiff's cause of action.

Certainly we do not question the correctness of the Supreme Court's decision. But we do say that *Courseview* and the case now before us are easily distinguishable on the facts involved. (1) In *Courseview* there was no indication that the confidential relationship had been terminated, or that the defrauded party had lost confidence in the perpetrator of the fraud, or had repudiated the relationship. In the instant case appellants terminated the fiduciary relationship in 1938 because they were convinced that appellee had committed fraud in obtaining certain oil properties from Mrs. Eastman. (2) Appellants here were about to file suit charging fraud against appellees, but a settlement was reached whereby for a valuable consideration appellants executed a release of all claims against appellees. (3) Nothing had happened in *Courseview* which could reasonably be expected to arouse the suspicion of the defrauded party; whereas in this case there were two transactions in 1938 which did arouse appellants' suspicions and caused them to discharge appellee Biggers as their attorney, and to exact a settlement of him for his alleged fraud. There are other distinguishing facts in the two cases, but we shall not lengthen this opinion by detailing them.

We cited *Courseview,* for one reason, because it is authority for holding that the question whether there is a legal duty to use the means at hand to discover fraud can be a question of law under some circumstances, rather than a question of fact for a jury. We think it was a question of law, in this case: there was a legal duty on the part of

Mrs. Eastman to use the means at hand to discover the fraud; and for twenty-seven years according to her own testimony she failed to use such means.

For another reason we cited *Courseview* because our Supreme Court in its opinion enunciated certain legal principles which, when applied to the particular facts of this case, compelled us to hold that limitations had run against appellants' cause of action.

Appellants take the position that once an attorney takes fraudulent advantage of his client limitations do not ever begin to run until the client has actual knowledge of the fraud—meantime the client is under no duty to exercise any diligence to discover the fraud. Such is not the law as stated by our Supreme Court.

We quote from the opinion in *Courseview*:

"* * * limitation does not begin to run in favor of a trustee and against the cestui until the latter has notice of a repudiation of the trust, and there is no duty to investigate *at least until the cestui has knowledge of facts sufficient to excite inquiry.* See Slay v. Burnett Trust, 143 Tex. 621, 187 S.W.2d 377; Moore v. Waco Building Ass'n, 19 Tex.Civ.App. 68, 45 S.W. 974 (wr. ref.). * * *

"*It is perhaps more accurate to say that the existence of a relation of trust and confidence does not change the rule that diligence in discovering the fraud is required but does affect the application of the rule.* See Edsall v. Edsall, Tex.Civ. App., 238 S.W.2d 285 (wr. ref. N.R.E.); First State Bank of Bangs v. Visart, Tex. Civ.App., 259 S.W. 987 (no writ); 28 Tex. Jur. Limitation of Actions, Sec. 73, p. 162. By entering into fiduciary relations, the parties consent as a matter of law to have their conduct measured by the standards of the finer loyalties exacted by courts of equity. * * * *We are not prepared to say, however, that one in a relationship of trust and confidence is always justified*

*as a matter of law in neglecting every precaution until something occurs to arouse his suspicions. * * * Each case must rest on its own facts, * * *.*" (Emphasis ours.)

In Cooper v. Lee, 75 Tex. 114, 12 S.W. 483 (1889), a case involving the relationship of attorney and client, one of the decisive facts was that the plaintiff had in his possession a deed which would have revealed the fraud in question if plaintiff had bothered to read the deed. We quote from the opinion in the case:

"* * * 'Our opinion is that if the alleged fraud constituted a sufficient reason why the plaintiff did not, at the time the deed was made, discover that it was a quitclaim, his subsequent failure to inform himself of the contents of his deed in so material a point was chargeable to his own neglect of ordinary precaution. * * *nor does it sufficiently appear that the alleged confidential relation of the parties continued until the discovery.' * * * we still do not, on the other hand, believe that the continued existence of the relation justified him in neglecting every precaution that a prudent man would exercise about his property. Notwithstanding the land was conveyed to him by his attorney, in whom he placed unlimited confidence, ordinary prudence dictated to him, as a man of common sense, to take advantage of the two years that the deeds were in his possession, to learn from them what land had been conveyed to him, * * *.*" (Emphasis ours.)

Our statement that the relationship of attorney and client ended in 1938 when Mrs. Eastman lost confidence in Biggers was based on the testimony of Mrs. Eastman herself as shown in her deposition. We quote:

"Q Mrs. Eastman, *you had lost all confidence* in Mr. Biggers at that time, had you not?

"A Yes, I had."

\* \* \* \* \* \*

"Q   And did you at that time lose your confidence in Mr. Biggers?

"A   Yes, I lost my confidence in Mr. Biggers.

"Q   *Did you continue to have any dealings with him despite the loss of confidence?*

"A   *Not really dealings, Mr. Lloyd. There were some loose ends that were finished up, I think. For instance that last paper that was signed was signed in December of 1938, but I did not continue to have dealings with him myself. If you mean did he handle any other business for me, no.*

"Q   *He didn't handle any other business for you?*

"A   *No.*"   (Emphasis ours.)

Following the termination of the relationship of attorney and client, Mrs. Eastman in 1940 contemplated filing suit against Biggers.   We again quote from her testimony:

"Q   And had you been in contact with Mr. Biggers prior to the time that Mr. McManus came in with respect to trying to work out something with him or do something with him?

"A   No.

"Q   Had you considered such a step?

"A   Not contacting Mr. Biggers.

"Q   *What had you considered, please?*

"A   *I had considered filing a suit against him.*

"Q   Yes, ma'am, and had you engaged the services of an attorney?

"A   No.

"Q   You and your husband had—

"A   No, I had run into a little difficulty in finding an attorney that would sue another attorney.

"Q   *Had you attempted to engage attorneys?*

"A   *Yes, I did.*

"Q   Who did you attempt to engage?

"A   Well, I tried Bill McGraw and I tried Charles McCombs.

"Q   And who else, any others?

"A   They are the two I remember most vividly.

"Q   And when had you contacted them with respect to this, please?

"A   Oh, that was in '40."

\* \* \* \* \* \*

"Q   You had discussed this with your husband, Mr. Eastman?

"A   *I told Mr. Eastman that I felt like I had just been rooked,* that Mr. Biggers had been supposedly attempting to get permits for me to drill wells and he couldn't get any and then after two and a half months—I was in financial difficulties, I mean I had to put on this pumping equipment on the well which all cost a lot of money and I sold him this interest for two thousand seven hundred fifty dollars to help me at that time.   That was what I sold it for.   *I told Mr. Eastman that I felt like I had been, well, betrayed was the word I used.*

"Q   And when you say you sold him this interest, you are referring to—

"A   Lots 8, 9, 10 and 11.

"Q   8 through 11 inclusive; is that correct?

"A   Yes.

"Q   And you had received two thousand seven hundred fifty dollars for that?

"A   I had."

\* \* \* \* \* \*

"Q   In any event, you had considered and attempted to employ counsel for the purpose of filing a suit?

"A   Yes.

"Q You had discussed it with Mr. Eastman?

"A Yes."

\* \* \* \* \* \*

"Q Yes, ma'am, but you were disimbued (sic) with Mr. Biggers by September 10, 1938, were you not, and you had no friendly relationships with Mr. Biggers; is that correct?

"A Not friendly, no." (Emphasis ours.)

Appellants claim that the written release which they signed on February 20, 1941, though broad in its terms, cannot be held to cover their claim of the alleged fraud of Biggers in regard to Lots 1, 2 and 3 of Block 117.

As shown by her testimony above quoted Mrs. Eastman lost confidence in Biggers in 1938 when she received a letter from him informing her that he had obtained permits for drilling wells on Lots 8–11 inclusive, which property she had previously assigned to Biggers for $2750. But this was not the only transaction which had caused her to lose "all confidence" in Biggers. Another transaction involved Lots 4–7 inclusive. In 1938 Biggers in another letter to Mrs. Eastman referred to an assignment from Mrs. Eastman to him covering the south 50 feet of the above named lots. We quote from her testimony:

"Q Mrs. Eastman, will you read that paragraph, please?

"A Yes.

"Q Will you read it?

"A 'The assignment to me on June 7th covered the south 50 feet of Lots 4, 5, 6 and 7. You will notice the corrected assignment covers the south 100 feet of Lot No. 7. I am asking for the south 100 feet of Lot No. 7 instead of the south 50 feet of Lot No. 7 \* \* \*.'

"Q *Mrs. Eastman, you testified that you received that letter and you were cog-nizant of it. In the light of statement contained in that paragraph, is it still your statement that you did not know anything about an assignment that you had made to Mr. Biggers covering Lots 4 through 7 until some time in 1965 when your son came to you and—*

"A Mr. Lloyd, it most certainly is, and if I had understood or known where the south 50 feet of Lots 4, 5, 6 and 7—for that fact, the middle of Lot No. 7 would have been right on my property. Do you think I wouldn't have tried to do something about it right then?

"Q Well, Mrs. Eastman, your testimony has been very clear that you were certain back in 1938 that the only thing that you assigned to Mr. Biggers was an interest in Lots 8 through 11?

"A That is just exactly what I am saying now.

"Q Yes, ma'am. And your testimony is in June of 1938 in your mind you were clear that at that time the only thing that you had assigned to Mr. Biggers was an interest in Lots 8 through 11; isn't that correct?

"A That is right.

"Q *Now, on September 10th, 11th or 12th, 1938, within three months—*

"A *Uh huh.*

"Q *—after the time you were so clear that all you had assigned was an interest in Lots 8 through 11, you received from Mr. Biggers a letter clearly setting forth that you had assigned an interest to him in Lots 4 through 7; isn't that correct?*

"A *He is stating that I did.*

"Q *Yes, ma'am, he makes that statement.*

"A He makes that statement, I didn't any more believe that, and he is asking me for another 50 feet.

"Q  He makes the statement that you had made that assignment to him?

"A  He sure did and he is asking me to give him another 50 feet." (Emphasis ours.)

At the very time Mrs. Eastman became disillusioned with Biggers in connection with the above two transactions she had in her lock box a copy of a contract dated June 3, 1938, *which she admits she signed*, whereby she sold all her interest in Lots 1, 2 and 3 to Biggers. We again quote from her testimony:

"Q  And you did have in your safety deposit box your signed copy of this contract?

"A  I did have.

"Q  And you had had it in your safety deposit box at all times since shortly after it was signed between you and Mr. Biggers; is that correct?

"A  That is right.

"Q  You could have at any time looked at and gone over and studied that document, could you not?

"A  If I had had any occasion to, yes.

"Q  But you say you had no occasion to?

"A  I had no occasion to.

"Q  *I see.  Now, you know that that contract refers to Mr. Biggers as buying all of your interest in Lots 1, 2 and 3—*

"A  I know.

"Q  —does it not?

"A  I have read the contract.

"Q  And that language has been in that contract ever since you got your copy, has it not?

"A  That is correct.

"Q  And your copy has been in your sole and exclusive possession?

"A  That is right, in the bank." (Emphasis ours.)

That the 1941 settlement and release in the minds of the parties was intended to cover much more than the permits on Lots 8–11 inclusive we think is apparent from the testimony of Mr. Eastman, husband of appellant Mrs. Eastman.  We quote:

"Q  Can you try to remember as best you can what was said when you first went in between Mr. Biggers and yourself, or Mr. McMannis?

"A  We went in and introduced ourselves.

"Q  All right.

"A  And Mr. McMannis then got into the discussion.

"Q  Well, can you tell us what Mr. McMannis said to Mr. Biggers?  If you will, try to remember.  It could be of importance.

"A  Mr. McMannis paced the floor in front of Mr. Biggers' desk and read the law to him on dealing' with a client where he had all the confidence, and that *he requested a return to the status quo of the properties that Mr. Biggers had dealt her out of.*"

\*     \*     \*     \*     \*     \*

"Q  *How long did this discussion take place?  I believe you said over a period of four or five hours?*

"A  *That's right.*

"Q  Can you tell us anything else that you heard Mr. McMannis say or Mr. Biggers say during that period of time?

"A  *During that period of time in the —Mr. McMannis* made a statement to Mr. Biggers that he wanted the properties *returned to the status quo,* as I stated before, that he had dealt with Mrs. Eastman on as a client.

"Q  *What did Mr. Biggers say when he said that?*

"A  *Oh, he said, 'I spent too much money getting these properties in operation'.  He said, 'I ain't about to do that'.*

*And Mr. McMannis said, 'If I have to, I'll come down from Iowa and get a license to practice law in the State of Texas and I'll prosecute it.'.'"*

\* \* \* \* \* \*

"Q I believe you mentioned when Mr. Biggers' counsel was examining you, that Mr. Biggers got a whole bunch of papers. When did that occur? How long had you been in the office before that happened?

"A *Well, that happened after there had been a—Mr. McMannis had—had recited that he wanted status quo and had recited the law of dealing with a client that he had the confidence that he brought these papers.*"

\* \* \* \* \* \*

"Q Can you tell us what was said between Mr. Biggers and Mr. McMannis at that time as to how they arrived at any sort of a settlement of the controversy?

"A *Well, Mr. Biggers offered to give an overriding royalty,* and that's what was supposed to be given, and nothing was supposed to have been given back. *This was in addition to what she already had. We didn't go up there to give him anything. We went up there to get back what he had dealt her out of.* Now, does that answer the question?" (Emphasis ours.)

Mrs. Eastman further testified as follows:

"Q Yes, ma'am. But you did freely and willingly make a settlement with Mr. Biggers in February, 1941?

"A I did."

The testimony of Biggers, though not conclusive as to appellants, is not without interest:

"Q (By Mr. Burroughs) All right. Go ahead and tell us what those people said to you and you said to them, please, sir, at the meeting.

"A They also, after I agreed to give them the 16th, or 4/16ths— I agreed to give them 4/16ths of my 15/16ths of one well.

Then she said, 'How about making that an override?' Asking for just a little more, you see. And I thought it was a little more because at that time the operating expenses were small. And just to satisfy her and her attorney, Mr. McManus, and her husband, I agreed to give her then a 1/16th override on my interest, which, as I say, was the same as 4/15ths of one well, and left me 11/15ths of one well, *and she would agree to give me a complete release on everything, because I was surprised at that call that I didn't know what other calls I might get. So, I wanted to button it up once and forever and get a final release on all of the matters that I had ever handled for her, or anything I bought from her, \* \* \*.*

"Q *Now, was Mrs. McGehee present at that time?*

"A *Yes sir.*

"Q *You're positive about that?*

"A *Positive.*"

\* \* \* \* \* \*

"A \* \* \* I was discussing four or five years, the life of those wells. He said, 'They might last longer and I think it might be fair to Mrs. McGehee that you just give her that, make it an override.' *and I agreed that if they would settle all claims (sic) of all kinds, character and nature and I didn't owe her anything, \* \* \*. That was—that was—this last February was 25 years ago.*" (Emphasis ours.)

With reference to the written settlement agreement Mrs. Eastman testified as follows:

"Q *And you were satisfied with what you did accomplish under the aid of your counsel at that time?*

"A *I felt like it was the best I could do under the circumstances.*

"Q *And you did execute and deliver the release which is in evidence releasing Mr. Biggers from any claim?*

"A *I did.*

"Q And that is your signature on there?

"A That is.

"Q And that was signed by you on the advice of your counsel, correct?

"A That is correct.

"Q And of your husband?

"A That is correct.

"Q Now, did you sign anything else on that occasion?

"A No, Mr. Biggers signed a paper, you know, to give us the override.

"Q To give to you—

"A The override." (Emphasis ours.)

From the foregoing testimony of Mrs. Eastman and her husband it appears that the alleged fraudulent assignment by Mrs. Eastman to Biggers of interest in Lots 1, 2 and 3 was not the transaction which initially caused her to distrust Biggers. Her loss of "all confidence" according to her testimony began when she discovered the alleged fraud in connection with two other transactions, one involving interests in Lots 8 to 11 inclusive and the other involving Lots 4 to 7 inclusive. Yet at the very time in 1938 that she decided she had been "rooked" and "betrayed" by Biggers she had in her lock box the copy of her assignment to Biggers of an interest in Lots 1, 2 and 3, which she admits she had signed, but did not bother to read until twenty-seven years later. It should be noted that Lots 1, 2 and 3, Lots 4 to 7 inclusive and Lots 8 to 11 inclusive are all parts of the same Block No. 117 in the Townsite of Kilgore. We think that her actual knowledge of the alleged fraud in connection with Lots 8 to 11 inclusive of Block 117 and Lots 4 to 7 inclusive of Block 117, was (to quote the language of our Supreme Court in *Courseview*) "sufficient to excite inquiry" in regard to her other transactions with Biggers, including the assignment of Lots 1, 2 and 3 in the same Block 117.

Furthermore, we cannot ignore the undisputed fact that in 1957 and again in 1958 Mrs. Eastman made assignments to her son Frank of interests in Lots 1, 2 and 3; and that in 1957 and again in 1958 Mrs. Eastman signed gift tax returns to the United States Government in which returns the assignments of interest in Lots 1, 2 and 3 were expressly mentioned. These assignments and returns were executed more than four years before this suit was filed.

Counsel for Mrs. Eastman in written briefs and in oral argument explains that in 1932 the lease on Lots 1, 2 and 3 had been pooled with the lease on Lots 4 to 11, therefore Lots 1, 2 and 3 were properly named in the assignments and gift returns, but only because they had come under the pooling agreement.

However Mrs. Eastman herself gives a different reason. She testified that the mention of Lots 1, 2 and 3 was due to mistakes on the part of her attorney at that time (not her present attorney )and on the part of her accountants in preparing the gift returns—which mistakes she did not catch as she signed the documents without reading them.

We quote from her deposition:

"Q Is that the assignment that you made dated October 31, 1957?

"A Yes.

"Q Of that interest in the oil and gas properties therein described which was a gift to your son and his wife by you?

"A That is correct.

"Q And it is the assignment which gave rise to the gift tax returr covering the calendar year 1957?

"A That is correct."

*    *    *    *    *    *

"Q Now, Mrs. Eastman, who prepared that assignment?

"A Mr. Charles Winikates.

"Q And do you say that Mr. Winikates made a mistake of some kind—

"A He certainly did in the description.

"Q In this?

"A Yes, because it says Lots 1, 2 and 3 up there on the first page and I did not have any interest in Lots 1, 2 and 3."

\* \* \* \* \* \*

"Q Mrs. Eastman, I hand you an exhibit marked B Mrs. E. 320. \* \* \* Can you identify that exhibit for us, please, ma'am?

"A I can, it is a gift tax return.

"Q Did you sign the original of that gift tax return?

"A I did.

"Q Are the statements contained in that gift tax return true and correct?

"A Well, I find out now that they are not. I find out that the accountant picked up the same error that Mr. Winikates apparently picked up when he made the assignments, because this does include 1, 2 and 3. This was called to my attention yesterday.

"Q Well, you signed it and turned it in to the United States government, didn't you?

"A Yes, I sure did.

"Q As being a true and correct presentation of the act that you had performed. Did you read it before you signed it?

"A Well, no, I didn't read it outside of the amounts to make sure they were correct. He got the division from the assignment that Mr. Winikates made up for Frank. You know as well as I do I didn't have any interest in 1, 2 and 3 in '57 if I ever had any."

\* \* \* \* \* \*

"Q (By Mr. Lloyd) Mrs. Eastman, I hand you a document that has been marked B Mrs. E. 326 and I will ask you to identify it.

"A That is a gift tax return in 1958."

Counsel for appellants has made a valiant and zealous attempt to show that Mrs. Eastman's claims of fraud allegedly perpetrated by Biggers in 1937 and 1938 in connection with Lots 1, 2 and 3 were not barred by the law of limitations when this suit was filed in 1967; and that the release she and her husband signed in 1941 does not stand in the way of her successful prosecution of this suit. But after again reviewing the record before us we adhere to our original opinion: it is our view that as a matter of law Mrs. Eastman either knew or by the exercise of diligence should have known of her claim in regard to Lots 1, 2 and 3 more than four years before she filed this suit in 1967.