**In re NATIONAL GYPSUM COM-
PANY, Aancor Holdings, Inc.,
Debtors.**

**Bankruptcy Nos. 390–37213–SAF–
11, 390–37214–SAF–11.**

United States Bankruptcy Court,
N.D. Texas,
Dallas Division.

Nov. 9, 1999.

Michael A. Rosenthal, Gibson, Dunn & Crutcher, Dallas, TX, for NGC Settlement Trust and The Asbestos Claims Management Corporation.

Sander L. Esserman, Stutzman & Bromberg, Dallas, TX, for Daniel M. Phillips, Legal Representative for Unknown Asbestos Disease Claimants.

Garland S. Cassada, Robinson, Bradshaw & Hinson, Charlotte, NC, Robert D. Albergotti, Haynes & Boone, Dallas, TX, for New NGC.

Mark H. Iola, Stanley, Mandel & Iola, Dallas, TX, for Personal Injury Trust Advisory Committee.

William R. Hanlon, Shea & Gardner, Washington, D.C., for the Center for Claims Resolution.

### MEMORANDUM OPINION AND ORDER

STEVEN A. FELSENTHAL,
Bankruptcy Judge.

The trustees for the NGC Settlement Trust move the court to authorize the trust to acquire an ownership interest in Trust Services, Inc. (TSI), to enter into a comprehensive services agreement with TSI and to enter into a shareholders' agreement with the Fuller–Austin Asbestos Settlement Trust (FA Trust) and TSI. The trust's bodily injury advisory committee

(TAC) supports the motion. The court-appointed Legal Representative does not oppose the motion. The National Gypsum Company (NGC) opposes the motion. The court conducted an evidentiary hearing on the motion on September 8, 1999. At the request of the trust, the court accepted a post-hearing brief from the trust on September 22, 1999.

NGC contends that the express provisions of the trust, as well as Texas law, prohibit the transaction. In addition, NGC questions the business justification for the transaction. NGC also asserts that the transaction impermissibly benefits the trust's managing trustee. The trust counters that the court has discretion under the trust agreement to authorize the transaction and that the trustees have established a business justification for the transaction.

Under the order confirming the first amended and restated joint plan of reorganization of NGC and Aancor Holdings, Inc., this court constitutes the supervisory court for the trust. The beneficiaries of the trust include persons exposed to National Gypsum-produced asbestos products whether or not they held a claim cognizable under the Bankruptcy Code at the time of the entry of the confirmation order. This court has jurisdiction to decide matters pertaining to the administration of the trust.

W.D. Hilton, Jr., Alan Kahn and Walter Taggart are the trustees of the NGC Settlement Trust. Hilton has been the trust's managing trustee for many years. Hilton has been appointed a trustee of the FA Trust. He also acts as the managing trustee of the FA Trust. Mark Peterson and Anne Ferazzi are the other two trustees of the FA Trust. Both Peterson and Ferazzi have played significant roles in the National Gypsum bankruptcy case. Peterson has been and continues to be the trust's expert witness concerning bodily injury claims of the trust's beneficiaries. Ferazzi had been an attorney for the Official Committee of Asbestos Claimants in the National Gypsum bankruptcy case.

On July 15, 1997, without opposition by the TAC, the Legal Representative or other parties in interest, including the National Gypsum Company, this court approved a transaction between the trust and TSI, a corporation formed by Hilton, to perform centralized operational and administrative services for asbestos-related trusts. Under the transaction, the trust would operate in the same building as TSI, share certain office resources with TSI and sell certain assets to TSI. At present, in addition to its relationship with the trust, TSI is providing services to Hilton as the property damage claims administrator for the Celotex Asbestos Settlement Trust, the Eagle–Picher Property Damage Trust and the Texas Political Entities Claims Action Settlement.

The trustees with the FA Trust now propose to utilize TSI to facilitate more efficient and economical operations. The trust proposes to purchase the shares of stock of TSI with the FA Trust, and to operate TSI as its sole owners. The trustees believe that TSI can perform common services required by each trust in an efficient and cost-effective manner. To accomplish this goal, the trust and the FA Trust have negotiated to purchase TSI and to enter a shareholders' agreement and a comprehensive services agreement.

TSI has 1,000 issued and outstanding shares, 499 owned by Hilton and the rest owned by Larry W. Green. TSI will redeem the shares in consideration of payments to Hilton and Green of $1.00 per share. Hilton had originally capitalized the corporation for $1,000.00. TSI will then issue one share to the trust and one share to the FA Trust. The trust will contribute capital assets to TSI valued at $28,010.00. The FA Trust will contribute $28,010.00. TSI has existing assets valued at $73,700.00.

TSI would enter into a comprehensive services agreement with the FA Trust and the NGC Settlement Trust. TSI would

provide financial services, investment services, administrative services, insurance collection services, litigation management services and claims management services. Each trust would pay its pro rata share of the expenses for those services.

Hilton would be employed by TSI and would serve as TSI's president. Kahn, Taggart, Peterson and Ferazzi would serve as the TSI board of directors. Hilton, through TSI, would continue to provide managing trustee services to both trusts. He would be paid an annual salary of $154,000, to be paid pro rata by the two trusts depending on the amount of his time devoted to each trust. In addition, TSI would continue to provide services to Hilton for his work for Celotex, Eagle–Picher and the Texas political entities settlement. Trust employees would become TSI employees.

The trustees assert that they would not delegate their fiduciary responsibilities and that they would maintain confidentiality. They request, however, that the court protect attorney-client privileges even though the attorneys would be advising TSI as well as the trust.

The shareholders' agreement would govern the relationship between the two trusts as the sole shareholders of TSI. The agreement would establish the procedure for the election of directors, provide for restrictions on the transfer of shares to third parties and create a mechanism to address withdrawal of a shareholder or deadlocks that may occur as a result of the equal ownership.

Kahn testified about the business judgment that supports the proposed transactions. Since 1994 or 1995, the trust has explored entering into a joint facility to obtain administrative support services. The trustees discussed the concept at quarterly trustee meetings, several attended by NGC representatives. Asbestos claimants have also supported the concept of joint administrative facilities.

Without Hilton's participation, Kahn and Taggart negotiated the transaction with the other two trustees of the FA Trust. Kahn testified that he and Taggart have a great deal of confidence in Hilton's administrative skills. They have authorized Hilton to serve as the managing trustee of the NGC Settlement Trust. Kahn and Taggart have paid him an annual salary of $180,000. From mid-June 1997 to mid-June 1998, Hilton spent approximately 2,000 hours on the trust's affairs. He logged 3,900 total hours for his work for the various trusts. But the work of the trust may be winding down, with an anticipated substantial completion within the next several years. The trust wants to retain Hilton's administrative services. By purchasing TSI, Kahn envisions an entity that will provide full-time employment opportunities for Hilton and other trust employees, allowing the trust to effectively retain their services.

The NGC trust would pay for the portion of the time of the employees it requires yet use TSI to assure full staffing. With a full staff, Hilton may delegate assignments, thereby improving efficiency.

In addition, Kahn testified that centralized costs may be allocated between the two trusts rather than being born by the NGC trust alone. He anticipates that the trusts would use TSI to share fixed expenses such as phone systems, computer systems and office space.

Kahn anticipates intangible benefits as well. With TSI, the trusts should be able to recruit and retain quality personnel. With its possibly limited life, employees may be reluctant to remain with the trust. TSI provides an opportunity for continued employment with services to several entities.

Under the proposed transaction, Hilton would no longer receive his $180,000 annual salary from the trust. Rather, TSI would pay Hilton an annual salary of $154,000 for services to both trusts. The trusts would pay their pro rata share of that salary. Hilton would continue to re-

ceive his trustee fees, $56,000 from the NGC trust and $50,000 from the FA trust. In addition, he may receive up to $80,000 for his work for Eagle–Picher which includes, apparently, a base fee of $30,000 and which also requires that Hilton pay all costs of providing the services. Hilton may also be paid up to $168,000 annually for his work with the Celotex trust. In its brief, the trust reports that the Celotex trust may continue for another two years. Last year, the NGC trust paid Hilton a $40,000 bonus. The Celotex trust also authorizes a bonus, which may be substantially lucrative depending on performance.

Thus, beginning with his position as a trustee of the NGC Settlement Trust and continuing to his experience as the trust's managing trustee, to the incorporation of TSI and to his other assignments, Hilton has developed an expertise and reputation for effective administrative skills. TSI, whether owned by Hilton and Green or by the two trusts, provides a vehicle for Hilton to capitalize on this skill and expertise.

The trust's bodily injury advisory committee and the Legal Representative provide the trust with advice from advocates of the trust's beneficiaries, the TAC for the known and current beneficiaries, the Legal Representative for the unknown and future beneficiaries. The TAC supports the motion. The Legal Representative does not oppose the motion. But the National Gypsum Company opposes the motion. Under the plan of reorganization, as confirmed by this court, NGC is liable for future bodily injury claims not resolved by the trust. NGC therefore has an interest in the affairs and management of the trust. Indeed, the confirmation order contemplates that NGC would have several options concerning future claimants, including indefinitely continuing to fund the trust in exchange for the court maintaining an injunction against asbestos-related litigation being commenced against the company. NGC is therefore a party with a sufficient interest in the trust's operations to have standing to object to this motion.

Texas law governs the trust. NGC Trust Agreement § 7.10. As an express trust, the Texas Trust Code applies. Tex. Prop.Code Ann. § 111.003. As here relevant, the express terms of the trust agreement prevail. Tex. Prop.Code § 111.002(a). The trust agreement specifically provides: "The Trustees shall not have the power to enter into any contract or otherwise engage in any transaction with any Trustee or any Person affiliated with any Trustee." § 3.01(e). This provision of the trust agreement reflects Texas Trust Code § 113.053(a).

■ The trust agreement further provides:

> 7.03 *Amendments.* Subject to the second sentence hereof, the Trustees may, after consultation with the TAC's, and with their consent where so provided herein or in the Procedures, modify, supplement or amend this Trust Agreement (other than Sections ... 3.01(e) ... such sections being herein individually and collectively called the "Court Approval Sections")... Amendments, modifications or supplements to any of the Court Approval Sections may be made by the Trustees only with the approval of the Court by entry of appropriate orders.

Trust Agreement § 7.03. This provision of the trust agreement reflects Texas Trust Code § 113.059. The trust agreement empowers the court to approve the transaction by modifying § 3.01(e). Accordingly, the court has discretion to approve the transaction. *Kuhn v. Vortex, Inc.,* 747 F.2d 1022, 1023 (5th Cir.1984).

The modification requested by the trustees concerns the trustees' administration of the trust. In administering the trust, the trustees shall perform all of the duties imposed on trustees by the common law. Tex. Prop.Code § 113.051. Accordingly, the court must exercise its discretion mindful of the duties imposed on the trustees by common law.

The trust agreement, reflecting Texas law, recognizes that trustees may not engage in self-dealing. *InterFirst Bank Dallas, N.A. v. Risser*, 739 S.W.2d 882, 888 (Tex.App.–Texarkana 1987). When a person accepts a fiduciary position, he consents as a matter of law to have his conduct concerning the trust measured by the standards of the finer loyalties exacted by courts of equity. The trustee may not use his position to gain personally at the expense of the trust. Nor may the trustee place himself in a position where his self-interest may conflict with his obligations as a trustee. These standards extend to every variety of circumstances. *Slay v. Burnett Trust*, 143 Tex. 621, 187 S.W.2d 377, 387–388 (1945).

When a trustee acts in his own interest in connection with the performance of his duties as trustee, the standard of behavior becomes more rigorous. Scott on Trusts § 170.25 (4th Ed.1987), at 436. Usually, a trustee may not sell to the trust his individual property or property in which he has a personal interest of such a substantial nature that it might affect his judgment. Restatement (Second) of Trusts § 170 (1957 Main Vol.), at 367; Scott on Trusts § 170.12, at 351. The Restatement instructs that it is immaterial that the trustee acts in good faith in purchasing the property for the trust, and that he pays fair consideration. *Id.* Consequently, the proposal that the trust purchase Hilton's stock in TSI is problematical.

The Restatement also instructs that a trustee should not sell trust property to a corporation in which he has a substantial interest. Restatement (Second) of Trusts § 170, at 365. But the Restatement further instructs that the court may approve a transaction between the trust and a corporation in which the trustee has an interest. *Id.*, at 366. As with the purchase of TSI's stock by the trust, the transfer of trust property to TSI does not involve significant assets or values. The record reflects a fair valuation for both transfers. But the court must analyze the fact and appearance of the transaction with the overall performance of trustee duties.

In that context, the court observes that the trustee may not delegate his trust duties. Scott on Trusts § 171 (4th Ed.1987), at 438. Upon acceptance of the trust by the trustee, the trustee is under a duty to the beneficiaries to administer the trust. Restatement (Second) of Trusts § 169. The trustee cannot commit the administration of the trust to an agent or a co-trustee or another person, unless permitted by the trust agreement. Restatement (Second) of Trusts § 171, at 374. And where a trustee has properly delegated to agents or co-trustees or other persons, the trustee maintains a duty to exercise general supervision over their conduct. *Id.*, at 376. Where a trust has several trustees, each trustee has a duty to participate in the administration of the trust. Restatement (Second) of Trusts § 184, at 394. These standards guide the court's exercise of discretion.

The trustees have established a business justification for the transaction. The benefits to the trust in centralizing administrative services with other trusts will exceed the costs and yield efficiency dividends for the trust. But, for seventy years, the common law has recognized that "[a] trustee is held to something stricter than the morals of the market place." *Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545 (N.Y.1928)(Cardozo, J.).

Hilton has demonstrated skill and expertise in administering asbestos trusts. Other trusts have recognized his experience. He has become a recognized professional trust administrator, selling his services to various trusts. However logical its origins, TSI has become a corporate entity to further the business of providing administrative services to these trusts. Hilton commands lucrative fees for those services, in excess of $300,000 annually, without considering bonuses and trustee fees.

Even with the utmost integrity, the proposed transaction will further Hilton's and his employees' business opportunities. In furthering those business opportunities, the trustee appears to act in his own interest in connection with the performance of his duties as trustee, requiring that the court rigorously examine the transaction.

In addition, Hilton, as trustee, must perform his duties without delegation and must administer the trust. He cannot allow his personal employment opportunities to interfere with his duties to administer the trust. TSI's business of providing administrative services compromises Hilton's efficacy and usefulness as a trustee. First as a managing trustee, then as an owner of TSI and now as the proposed president of TSI commanding a significant private business of trust administration, Hilton has had to delegate his trustee duties in part to Kahn and Taggart. That delegation of trustee duties must necessarily increase with this transaction.

Because they have used Hilton as the managing trustee, Kahn and Taggart already have to make compensation decisions without the benefit of the trust's third trustee, Hilton. Hilton cannot participate in the decisions concerning TSI. Hilton cannot participate in the trust's deliberations concerning administrative decisions. With Hilton as the president of TSI, paid by TSI, using TSI as a vehicle for a substantial practice of providing administrative services to asbestos trusts, and with TSI providing administrative services to the trust, Hilton must excuse himself from performing his trustee's duties concerning matters to be performed by TSI. Hilton will not be able to perform trust duties concerning decisions about the financial services, investment services, administrative services, insurance collection services, litigation management services and claims management services to be performed by TSI under contract. Kahn and Taggart must perform those trustee duties as if the trust was a two-trustee body, with Hilton at TSI executing those decisions as

if merely a third party professional retained by the trust. Hilton would be delegating duties to his co-trustees and would be unable to perform supervisory duties where delegation to a third person may be appropriate.

 The court recognizes that it previously authorized the initial TSI transaction with Hilton, and that the court has accepted Hilton's role as managing trustee when he confined his activities solely to the NGC Settlement Trust. The court also recognizes that a trustee may be compensated for services rendered to the trust even as an officer of a corporation. Restatement (Second) of Trusts § 170, at 371. And the court further recognizes that a trustee may serve on separate trusts that engage in transactions between the two trusts provided the transactions fairly treat each trust. *Id.,* at 371. But Justice Cardozo's admonition nevertheless now becomes apparent: "Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd." *Meinhard,* 249 N.Y. at 464, 164 N.E. 545.

Hilton has developed a significant and lucrative business of providing professional administrative services to trusts. As Kahn testified and as his compensation reflects, Hilton's skills, experience and expertise at administering these trusts is valued. He naturally has an interest in furthering the business opportunities that that experience generates. The trusts have an understandable desire to employ or contract the services of a person best able to provide administrative services.

But in the evolution of that process, Hilton's interest in providing administrative services under contract and/or through TSI has the appearance, if not the reality, of personal gain and has necessarily interfered with his duty to administer the trust and to not delegate trustee

duties. Two rather than three trustees have the duties imposed by the trust agreement on all three trustees to administer the trust whether directly or through contract or through establishing a jointly-owned facility. It appears to the court that Hilton has compromised his ability to fully perform his trustee duties without encumbrance or hindrance. He thereby imposes on Kahn and Taggart a disproportionate amount of trustee duties not contemplated by the trust agreement establishing three trustees.

Nor can the court take comfort by the assertion that the transaction has been negotiated at arm's length. The interrelationship of the trustees of the two trusts and the TSI employees compromises an arm's length negotiation.

The court has thus become concerned with the disintegrating erosion of particular exceptions. If indeed Hilton has become a professional, valued administrator, the court questions whether he should now pursue that work without the fiduciary restrictions of being a trustee. However logical or natural the evolution of circumstances and however justified from a marketplace perspective, the court questions whether the proposed transaction would result in placing the administration of the trust at the "level ... trodden by the [marketplace] crowd." Having moved over time from merely administering the NGC Settlement Trust, the court now suggests that Hilton consider resigning as a trustee of the NGC Settlement Trust. A new trustee could then be appointed. The three trustees could then evaluate the proposed transaction without the cloud of the present circumstances.

In making this suggestion, the court recognizes that the TAC supports the motion and the Legal Representative does not oppose the motion. But that does not amount to a full disclosure to all the beneficiaries nor does it amount to consent by all the beneficiaries. The court also does not suppose that NGC has lodged its objection to the motion with altruistic motives. But regardless of motivation, NGC, under the law of the case at present, bears liability for the satisfaction of claims of a significant subset of the trust's beneficiaries and may satisfy that liability while shielding itself from litigation by capitalizing the trust. NGC may therefore advocate before the court that the trustees be held to the exacting standards imposed by courts of equity.

The court has accordingly decided to carry this motion on its docket for 45 days to permit the trustees of the NGC Settlement Trust to further consider the matter, specifically including whether Hilton should resign from the trust to allow him to perform his business of providing administrative services to asbestos trusts without the fiduciary obligations of a trustee.

Based on the foregoing,

**IT IS ORDERED** that the motion shall be carried on the court's docket for 45 days from the date of entry of this order.